COURT OF APPEALS OF VIRGINIA

Present: Judges Frank, Felton and Kelsey
Argued at Richmond, Virginia


BOBBY RAY BARKLEY

                                        OPINION BY
v.    Record No. 2885-01-2           JUDGE D. ARTHUR KELSEY
                                        FEBRUARY 11, 2003
COMMONWEALTH OF VIRGINIA


           FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                     Walter W. Stout, III, Judge

          Matthew T. Paulk (Blackburn, Conte,
          Schilling & Click, P.C., on brief), for
          appellant.

          Marla Graff Decker, Assistant Attorney
          General (Jerry W. Kilgore, Attorney General,
          on brief), for appellee.


     The trial court convicted the appellant, Bobby Ray Barkley,

of possession of marijuana with intent to distribute and of

maintaining a common nuisance.  On appeal, Barkley claims that

the trial court erred by not suppressing evidence found during a

search of his premises.  The search, Barkley argues, followed an

unlawful seizure of him by the police.  In particular, Barkley

contends that the officers performed a coercive investigatory

stop at his premises without first obtaining a reasonable,

articulable suspicion that he may be engaged in criminal

activity.  Finding no merit in either argument, we affirm the

trial court's denial of the suppression motion.

On appeal from a denial of a suppression motion, we examine the evidence in the light most favorable to the Commonwealth, giving it the benefit of any reasonable inferences. Bass v. Commonwealth, 259 Va. 470, 475, 525 S.E.2d 921, 924 (2000); Sabo v. Commonwealth, 38 Va. App. 63, 69, 561 S.E.2d 761, 764 (2002).

On March 9, 2001, Officers Wendell Miracle and Steve Drew of the Richmond Police Department visited 3214 West Franklin Street, Apartment B, to investigate a Crime Stoppers' tip. The tip alleged that male and female juveniles at that location were using and selling marijuana and cocaine. Sergeant Drew, dressed in plain clothes and wearing a chain displaying his badge, and Sergeant Miracle, wearing his police uniform, parked in front of Apartment B in their marked police car. The officers then approached the front door of the apartment and knocked.

Bobby Ray Barkley answered the door, came out to the front porch with the officers, and asked the officers how he could help them. Sergeant Drew informed Barkley that they were there to "investigate a complaint on the residence . . . the building itself or the home itself." After informing Barkley that he was not under arrest, Drew explained that the police had received a tip that "possible illegal activity was going on there at the residence," particularly the sale and use of illegal drugs. To put Barkley "at ease" and to ensure that he was aware of his

rights, Drew then informed him of his Miranda rights.  Barkley, in response, acknowledged that he understood his rights.  He then admitted to the officers that he occasionally smoked marijuana, but claimed that no one sold drugs from the apartment.

While the three men talked on Barkley's front porch, several people walked back and forth in front of the apartment, glancing at the officers and Barkley as they did so.  Barkley commented that his neighbors were "nosey," so Drew asked if the conversation could continue inside the apartment.  Without hesitation, Barkley allowed the officers in the apartment.

Once inside, Barkley led the officers directly to his bedroom, which also served as a den.  Drew continued to explain the purpose of their visit and again asked Barkley whether he was aware of any illegal activity at the residence.  During this discussion, both officers noticed a marijuana "stem" plainly appearing in an ashtray.  The officers brought the stem to Barkley's attention and again informed him of his Miranda rights.  Barkley reiterated that he occasionally used marijuana. He then removed a bag containing marijuana from his dresser.

Drew, believing that additional contraband was located within the apartment, asked Barkley if he could search the rest of the residence.  Barkley asked the officers if he had to allow the search.  Drew acknowledged that Barkley did not have to, but stated that the officers' observations gave them probable cause

- 3 -

to obtain a search warrant for the premises. Barkley gave permission, claiming that the officers would probably "go ahead and search" regardless of his answer. Sensing that Barkley was apprehensive, Drew explained that a search would not occur without his consent or a warrant. Further, Drew told Barkley that he remained free to withhold his consent. Barkley then told the officers to "go ahead and search." The officers asked Barkley "a couple more times" whether he consented. After determining that Barkley's consent was voluntary, the officers performed the search and recovered a total of one and one-half pounds of marijuana.

Before trial, Barkley filed a motion to suppress the evidence gathered during the search of his apartment. The officers' initial encounter at Barkley's apartment was a <u>Terry</u> stop, Barkley argued, and the officers' absence of a reasonable suspicion invalidated the subsequent search. Barkley specifically claimed that the officers' conduct amounted to a show of force, which would have led any reasonable person in his position to believe that he was being detained. Finding the officers' conduct reasonable, the trial court disagreed and denied the motion to suppress.

The trial court convicted Barkley of possession of marijuana with the intent to distribute in violation of Code § 18.2-248.1 and of maintaining a common nuisance in violation of Code § 18.2-258. Barkley was sentenced to ten years for the

- 4 -

marijuana charge and twelve months for the nuisance charge.  The trial court suspended six years of the possession charge and six months of the nuisance charge.  Barkley now appeals, claiming that the trial court erred by denying his motion to suppress.

## II.

Though the ultimate question whether the officers' conduct violated the Fourth Amendment triggers de novo scrutiny on appeal, we defer to the trial court's findings of "historical fact" and give "due weight to the inferences drawn from those facts by resident judges and local law enforcement officers." Davis v. Commonwealth, 37 Va. App. 421, 429, 559 S.E.2d 374, 378 (2002) (citing Neal v. Commonwealth, 27 Va. App. 233, 237, 498 S.E.2d 422, 424 (1998)).  We examine the trial court's factual findings only to determine if they are plainly wrong or devoid of supporting evidence.  See Mier v. Commonwealth, 12 Va. App. 827, 828, 407 S.E.2d 342, 343 (1991).

In addition, the appellant must show that the trial court's decision "constituted reversible error."  McGee v. Commonwealth, 25 Va. App. 193, 197, 487 S.E.2d 259, 261 (1997) (en banc) (citations omitted); see also Davis, 37 Va. App. at 429-30, 559 S.E.2d at 378.  "Absent clear evidence to the contrary in the record, the judgment of a trial court comes to us on appeal with a presumption that the law was correctly applied to the facts." Yarborough v. Commonwealth, 217 Va. 971, 978, 234 S.E.2d 286,

- 5 -

291 (1977); Oliver v. Commonwealth, 35 Va. App. 286, 297, 544 S.E.2d 870, 875 (2001) ("The trial court's judgment is presumed to be correct."); Dunn v. Commonwealth, 20 Va. App. 217, 219, 456 S.E.2d 135, 136 (1995).

III.

A.

Barkley admits that the police officers had the right to visit his property, but he contends that three separate aspects of the visit transformed the encounter into an unconstitutional seizure. First, Barkley claims that the officers seized him by implying that he was participating in drug activity. This veiled accusation, Barkley argues, would compel any reasonable person to submit to the officers' questioning. Second, Barkley argues that the officers' appearance and conduct amounted to a show of force that negated his ability to walk away. Finally, Barkley contends that the officer's reading of his Miranda rights indicates that he had been seized. This stop was unlawful, Barkley then concludes, because the officers did not reasonably suspect his involvement in criminal activity. Finding that the officers' conduct did not convert the consensual encounter into a seizure, we disagree.

The Fourth Amendment "does not proscribe all seizures, only those that are 'unreasonable.'" Hodnett v. Commonwealth, 32 Va. App. 684, 690, 530 S.E.2d 433, 436 (2000) (quoting Welshman

v. Commonwealth, 28 Va. App. 20, 30, 502 S.E.2d 122, 126-27 (1998) (en banc)); see also Hamlin v. Commonwealth, 33 Va. App. 494, 499, 534 S.E.2d 363, 365 (2000).  The Constitution simply "does not proscribe reasonable searches and seizures."  Murphy v. Commonwealth, 37 Va. App. 556, 564, 559 S.E.2d 890, 893 (2002).

With regard to seizures, reasonableness depends largely on the extent of the individual's loss of freedom compared to the officer's level of suspicion of criminality against the individual.  Officers performing a full custodial arrest, for instance, must have probable cause.  See Ross v. Commonwealth, 35 Va. App. 103, 105, 542 S.E.2d 819, 820 (2001).  For an investigatory stop, officers need only articulate a reasonable suspicion that criminal activity "may be afoot."  United States v. Arvizu, 534 U.S. 266, 273 (2002).  These requirements ensure that an individual's liberty is compromised only for a legitimate reason.  Id.; Terry v. Ohio, 392 U.S. 1, 30 (1968).

Not all interactions between law enforcement and citizens require the police to suspect the individual's participation in a criminal activity.  Officers need not have any particularized suspicion, for example, to approach "individuals on the street or in other public places" and then put "questions to them if they are willing to listen."  United States v. Drayton, 536 U.S. 194, 122 S. Ct. 2105, 2110 (2002).  Provided the officer refrains from inducing "cooperation by coercive means," he needs

- 7 -

no suspicion of criminality to "pose questions, ask for identification, and request consent to search luggage." Id. (citing Florida v. Bostick, 501 U.S. 429, 434-35 (1991)) (citations omitted); see also McClellan v. Commonwealth, 37 Va. App. 144, 151, 554 S.E.2d 669, 702 (2001); Commonwealth v. Satchell, 15 Va. App. 127, 131, 422 S.E.2d 412, 415 (1992) (quoting Florida v. Royer, 460 U.S. 491, 497 (1983)).

An officer questioning a citizen exceeds the scope of his authority and effects a seizure only when, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." California v. Hodari D., 499 U.S. 621, 628 (1991) (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980)). This "reasonable person test," the United States Supreme Court has explained, "presupposes an innocent person." Bostick, 501 U.S. at 437-38 (emphasis in original). Framed in such a way, this test guarantees that Fourth Amendment protections do not "vary with the state of mind of the particular individual being approached." Wechsler v. Commonwealth, 20 Va. App. 162, 170, 455 S.E.2d 744, 747 (1995) (citations omitted).

Several factors determine whether an officer "by means of physical force or show of authority" would cause a reasonable person to feel seized. Mendenhall, 446 U.S. at 554-55; see also Sykes v. Commonwealth, 37 Va. App. 262, 268, 556 S.E.2d 794, 797 (2001). "The threatening presence of several officers, the

- 8 -

display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled" all shed light on whether a seizure has occurred. Andrews v. Commonwealth, 37 Va. App. 479, 490, 559 S.E.2d 401, 407 (2002) (citations omitted).

We also examine what, if anything, the officer stated to the individual during the encounter. Identifying an individual as a suspect may create a seizure; merely informing an individual that the officers are "conducting a general investigation in response to a report of drug dealing" does not. McGee, 25 Va. App. at 200-01, 487 S.E.2d at 262-63; see also Davis, 37 Va. App. at 431-32, 559 S.E.2d at 379 (a "specific allegation of criminal wrongdoing to the suspect . . . is highly significant among the totality of factors," but it does not "automatically negate a finding of a consensual encounter").

Based on these principles, we reject Barkley's argument that the "implication of the officers' words and conduct" fingered Barkley as a suspect and would have made any reasonable person in his position feel not free to leave.[1] Barkley

--------

[1] Barkley does not contend that the officers' entry to his front porch offended his Fourth Amendment rights. See Shaver v. Commonwealth, 30 Va. App. 789, 796-97, 520 S.E.2d 393, 396-97 (1999) (concluding that individuals do not have a reasonable expectation of privacy "in areas that the passing public can observe"). Because Officers Drew and Miracle entered Barkley's front porch, an area accessible by any member of the public,

- 9 -

correctly notes that a reasonable person may feel seized "when a police officer confronts a person and informs the individual that he or she has been specifically identified as a suspect in a particular crime." McGee, 25 Va. App. at 200, 487 S.E.2d at 262. This rule, however, applies only when officers expressly inform an individual that they specifically suspect his participation in a crime. It does not apply where, as here, the officers did not identify Barkley as the target of their search. To the contrary, they informed Barkley that the purpose of their visit was to "investigate a complaint on the residence . . . the building itself or the home itself." When combined with the fact that the officers expressly informed Barkley that he was not under arrest, this general explanation would not make a reasonable, innocent person feel detained.

Nor did the officers' conduct, when viewed in the totality of the circumstances, create a "threatening presence" sufficient to convert the encounter into a seizure. Andrews, 37 Va. App. at 490, 559 S.E.2d at 407. After parking their squad car directly in front of Barkley's apartment, the officers knocked on Barkley's door, informed him of the purpose of their visit, and told him he was not under arrest. While talking, neither

---

their initial approach was reasonable. See id. at 796, 520 S.E.2d at 397 ("If one has a reasonable expectation that various members of society may enter the property in their personal or business pursuits, he should find it equally likely that the police will do so." (citations omitted)).

officer blocked access to the house or to the street. Although both officers carried guns, neither displayed their weapons in a threatening manner. "That most law enforcement officers are armed is a fact well known to the public. The presence of a holstered firearm thus is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon." Drayton, 122 S. Ct. at 2112. The officers' mere presence at Barkley's apartment, without more, failed to heighten a reasonable, innocent person's anxiety to the point of feeling seized by the police. See id. (Police officers "are often required to wear uniforms" and display badges, which "is cause for assurance, not discomfort.").

Officer Drew's reading to Barkley his Miranda rights does not compel a different result. While Miranda warnings are required "only when an individual is in custody and subjected to interrogation," Garrison v. Commonwealth, 36 Va. App. 298, 309 n.1, 549 S.E.2d 634, 640 n.1 (2001) (citations omitted), giving these warnings does not necessarily place the individual "in custody" at the level of restraint associated with a formal arrest. Davis v. Allsbrooks, 778 F.2d 168, 172 (4th Cir. 1985). As the United States Court of Appeals for the Fourth Circuit explained:

> To hold that the giving of Miranda warnings
> automatically disables police from further
> questioning upon a suspect's slightest
> indication to discontinue a dialogue would
> operate as a substantial disincentive to

> police to inform suspects of their constitutional protections. It would convert admirable precautionary measures on the part of officers into an investigatory obstruction.

Id. For similar reasons, advising an individual of his Miranda rights, by itself, does not transform an otherwise consensual encounter into an investigatory seizure. See State v. Green, 575 A.2d 1308, 1314 (N.H. 1990) (giving Miranda warnings is merely one factor to consider). Depending on the circumstances, advising a citizen of his legal rights may have no coercive impact. On the other hand, coupled with other indicia of coercion, it might corroborate the objective reasonableness of the individual's belief that he was not free to leave.

In this case, we agree with the trial court's conclusion that the officers gave the Miranda warnings out of "an abundance of caution." Informing Barkley of his Miranda rights did not create a seizure where, as here, he "was not physically restrained, and the tone of the interview was relaxed, non-accusatory, and informal." Green, 575 A.2d at 1314. By providing this information to Barkley, the officers did nothing more than inform him of his legal rights in advance of the legal necessity for doing so. Nothing in Miranda or its progeny suggests that proactivity of this kind should be discouraged.

Satisfied that the encounter between the officers and Barkley did not constitute a seizure, we now examine whether Barkley consented to the search of his apartment. The officers needed Barkley's consent at two separate stages of the encounter: to enter the house and, once inside, to perform a search of the entire apartment. We find that the Commonwealth proved Barkley's consent at both stages.

"At the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." Kyllo v. United States, 533 U.S. 27, 31 (2001) (internal quotations and citations omitted). So sacred is the home that the Constitution will not tolerate a physical invasion of it "by even a fraction of an inch." Kyllo, 533 U.S. at 37 (citations omitted). Absent a warrant, consent, or exigent circumstances, the Fourth Amendment will invalidate any police entry into a suspect's home. See Payton v. New York, 445 U.S. 573, 586 (1980); Robinson v. Commonwealth, 31 Va. App. 479, 484, 524 S.E.2d 171, 173 (2000).

As the United States Supreme Court recently reiterated, an individual's consent to a search must be voluntary and uncoerced.

> In a society based on law, the concept of agreement and consent should be given a weight and dignity of its own. Police officers act in full accord with the law

> when they ask citizens for consent. It reinforces the rule of law for the citizen to advise the police of his or her wishes and for the police to act in reliance on that understanding. When this exchange takes place, it dispels inferences of coercion.

Drayton, 122 S. Ct. at 2114. The Commonwealth bears the burden of demonstrating that an individual's consent was "freely given." Lowe v. Commonwealth, 218 Va. 670, 678, 239 S.E.2d 112, 117 (1977) (citations omitted). Whether the consent was "voluntary or was the product of duress or coercion, express or implied" is a question of fact hinging on the totality of the circumstances. Commonwealth v. Rice, 28 Va. App. 374, 378, 504 S.E.2d 877, 879 (1998) (citations omitted). That a citizen was not warned of his right to refuse consent to a search does not, standing alone, render the search nonconsensual. Rather, the "totality of the circumstances must control, without giving extra weight to the absence of this type of warning." Drayton, 122 S. Ct. at 2113.

Officers who have obtained an individual's consent to search must not exceed the scope of their permission. The test for the scope — "whether it is objectively reasonable for the police to believe that the consent permitted them to search where they did" — limits the scope to the "expressed object" of the search. Lawrence v. Commonwealth, 17 Va. App. 140, 145, 435 S.E.2d 591, 594 (1993) (citing Florida v. Jimeno, 500 U.S. 248, 251 (1991)), aff'd, 247 Va. 339, 443 S.E.2d 160 (1994). While

- 14 -

performing a consensual search, however, officers need not shield their eyes from unrelated contraband appearing in plain view. They may "lawfully seize an item that they discover in plain view if they have probable cause to believe that the item in question is evidence of a crime or contraband." McNair v. Commonwealth, 31 Va. App. 76, 82-83, 521 S.E.2d 303, 307 (1999) (en banc) (citations and internal quotations omitted).

Here, Barkley freely allowed the officers inside his home and then into his bedroom. Although he did not give them permission to search for contraband, the marijuana stem was in plain view. The officers immediately noticed the "very distinctive look" of the stem and recognized the stem's incriminating character. This plain-view observation was permissible. See Armstrong v. Commonwealth, 29 Va. App. 102, 110-11, 510 S.E.2d 247, 251-52 (1999) (recognizing that the police possessed probable cause by viewing an item that appeared to be crack cocaine). Barkley, after admitting that he used marijuana, took a bag of marijuana from his dresser and gave it to the officers.

After finding the stem and the stash of Barkley's marijuana, the officers obtained his consent to search the apartment. Explaining that the evidence recovered gave the officers probable cause to obtain a search warrant, Officer Drew asked whether he could search the premises. In doing so, he told Barkley that he was still free to decline their request.

Barkley nevertheless consented. To ensure that this consent was voluntary, the officers questioned Barkley about his answer. Barkley listened and again gave his consent for the search. Only then did the officers perform the search and recover additional marijuana.

The facts indicate that this consent was free and voluntary. Throughout the encounter, Barkley remained cooperative. He answered the officers' questions honestly. He freely admitted using marijuana and "opted to give" some to the officers. He questioned the officers about his rights. At every stage of the encounter he appeared relaxed. As the officers described Barkley, "he was very laid back" and had his "hands in his pockets."

The absence of any coercive, threatening, or intimidating conduct by the officers provides additional weight to the conclusion that Barkley's consent was voluntary. The officers openly informed Barkley of the reason for their visit. They told Barkley that he was not under arrest, and on more than one occasion informed him of his rights. They did not handcuff Barkley, threaten physical or legal force against him at any point, or interfere with his freedom of movement. Finally, the officers' statement that they could obtain a search warrant for the premises did not coerce Barkley. Instead, it merely informed him of his options. See Limonja v. Commonwealth, 8 Va. App. 532, 544, 383 S.E.2d 476, 483 (1989). Given Barkley's

- 16 -

cooperative attitude and the noncoercive nature of the officers' conduct, the trial court correctly held that the search of Barkley's home was entirely consensual.

IV.

Settled Fourth Amendment principles govern this appeal and validate the officers' search of Barkley's apartment. The officers' conduct, when viewed in the light most favorable to the Commonwealth, lacks the elements of coercion necessary to turn the initial conversation into a seizure. The Commonwealth also satisfied its burden of proving that Barkley consented to the search of his apartment. For these reasons, we affirm the trial court's denial of Barkley's motion to suppress.

Affirmed.