COURT OF APPEALS OF VIRGINIA


Present:   Judges Elder, Humphreys and Kelsey
Argued at Richmond, Virginia


WILBUR ALPHONSO CLAY

                                                MEMORANDUM OPINION* BY
v.        Record No. 0597-05-2                  JUDGE D. ARTHUR KELSEY
                                                   MARCH 28, 2006

COMMONWEALTH OF VIRGINIA


              FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
                          Cleo E. Powell, Judge

          Kevin Purnell (Dinkin & Purnell, PLLC, on brief), for appellant.

          Michael T. Judge, Assistant Attorney General (Judith Williams
          Jagdmann, Attorney General, on brief), for appellee.


      Wilbur Alphonso Clay appeals his conviction of assault and battery on two grounds.  He

first argues that the trial court erred in denying his motion to suppress a photograph of him taken

by a police officer.  Clay also claims the trial court erroneously admitted evidence of the victim's

identification of him in a pretrial photo lineup.  Finding neither assertion persuasive, we affirm.

                                            I.

      "On appeal from a denial of a suppression motion, we must review the evidence in the

light most favorable to the Commonwealth, giving it the benefit of any reasonable inferences."

Kyer v. Commonwealth, 45 Va. App. 473, 477, 612 S.E.2d 213, 215 (2005) (en banc) (citation

omitted); see also Hodges v. Commonwealth, 45 Va. App. 735, 775, 613 S.E.2d 834, 853 (2005).

      The victim, a thirteen-year-old girl, went to a Target store with her mother and two

younger sisters.  Her mother permitted her and a younger sister to walk alone to the toy

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

department near the back of the store to look at dolls. The victim noticed a man following her. She had seen him earlier near the snack area at the front of the store. The man walked up to the victim in the toy department and spoke to her. He walked directly behind her. While the victim worried about why the man was standing so close to her, he bent over like he was "going to look at something" and then touched her buttocks with his hand. She looked him "straight in the eye" and told him not to touch her. The victim and her younger sister then ran away to find their mother. "Teary eyed" and "panicky," the victim told her mother what had just happened.

The mother alerted the Target security officers, who summoned the police. Detective Humphries arrived and interviewed the victim. The victim described (first to the initial patrol officer and later to Humphries) the man who touched her as a black male wearing a baseball cap, blue jeans and a white T-shirt, both splattered with paint. Across the front of the shirt was written "Sherwin Williams," a painting company. Of medium height, the man had a skinny build and was not wearing any jewelry. He also had a "scraggly looking" mustache with "scruffy chin hair" on his face.[1]

Several weeks later, Officer Breeden received a dispatch that the suspect might again be at the Target store. Breeden was put in contact with the victim's father by phone, who described the man as a "tall black male, wearing a white shirt and talking on a cell phone." Breeden arrived in the Target parking lot and saw Clay standing in front of Target wearing a white shirt and talking on his cell phone. Breeden exited his vehicle, approached Clay, and asked if he could speak with him once Clay finished his phone conversation.

After Clay got off the phone, Breeden told Clay that he matched the description of a suspect and asked to see his driver's license. Clay provided his license to Breeden, who went

_____

[1] At trial, the victim said she advised the police the man had "really dark skin." That particular aspect of the perpetrator's description, however, does not appear in the officers' testimony or incident report.

back to his police car. Breeden then spoke again with the victim's father, who recounted some details of the incident. Afterwards, Breeden returned Clay's license and told Clay he was "free to go or have a nice day."

When this initial encounter ended, Clay asked Breeden for more information about the crime he was investigating. After a brief response, Breeden asked Clay if he could look at Clay's vehicle. Breeden testified that he intended to write down Clay's license plate number. Clay willingly agreed and, as they walked, continued to ask Breeden what the police knew about the offense. In response, Breeden directly asked Clay if he had touched a girl inappropriately at the Target store a few weeks ago. Clay said no. Breeden then asked if Clay had any objection to having his picture taken. "Is that really necessary," Clay asked. No, Breeden answered, he could get the picture from DMV in any event. Clay then agreed to have his picture taken.

Breeden did not have his camera with him at the time. It was in his police cruiser parked nearby. While he walked to his vehicle to get the camera, Breeden stopped and spoke briefly with Officer Nash. Nash had been having lunch with his family and walked over to Breeden to see if he needed assistance. Breeden asked Nash if he "minded keeping an eye" on Clay as Breeden retrieved his camera. Nash agreed and walked over to Clay, who was unaware of Breeden's brief exchange with Nash. Clay and Nash engaged in small talk as Breeden returned with the camera. Breeden then took two pictures of Clay, one with and one without his hat. The three then went their separate ways.

At the police station, a photo lineup technician added Clay's hatless picture to a photo array with five other black men with varying degrees of facial hair. Detective Humphries took this photo lineup to the victim. Without equivocation, she picked out Clay's photo as the man who touched her at Target. At trial, the victim again identified Clay in person as the perpetrator and reaffirmed her confidence in her identification. In response, Clay presented the testimony of

his fiancée who stated that Clay normally wore a lot of jewelry — something the victim had not mentioned in her initial description. On cross-examination, however, Clay's fiancée admitted that he had been painting on the day of the incident. Following her testimony, Clay elected not to take the stand in his own defense.

Sitting as factfinder, the trial judge found Clay guilty. She denied Clay's motion to suppress, holding that the photo was taken during a consensual encounter. She also denied Clay's assertion that the police photo lineup violated Clay's due process rights. The photo lineup, the trial judge held, did not impermissibly manipulate the victim's identification of Clay as the perpetrator. All of the photos were "reasonable approximations of the description given" by the victim to the police, the judge found. She also held the victim's multiple opportunities to view the perpetrator's face rendered the in-court identification admissible in any event.

II.

A.  MOTION TO SUPPRESS CLAY'S PHOTOGRAPH

Though the ultimate question whether the officers violated the Fourth Amendment triggers *de novo* scrutiny, "we defer to the trial court's findings of 'historical fact' and give 'due weight to the inferences drawn from those facts by resident judges and local law enforcement officers.'" Slayton v. Commonwealth, 41 Va. App. 101, 105, 582 S.E.2d 448, 449-50 (2003) (citations omitted). To prevail on appeal, "the defendant must show that the trial court's denial of his suppression motion, when the evidence is considered in the light most favorable to the prosecution, was reversible error." Id. (quoting Whitfield v. Commonwealth, 265 Va. 358, 361, 576 S.E.2d 463, 464 (2003)); see also Barkley v. Commonwealth, 39 Va. App. 682, 690, 576 S.E.2d 234, 238 (2003).

In this case, Clay does not contest the legality of the initial encounter which ended with Officer Breeden advising him that he was "free to go or have a nice day." At that point, Clay

concedes, any detention he may have been under was lifted and he was in fact free to go. Clay instead claims that Officers Breeden and Nash converted an otherwise consensual encounter into a seizure at the time they photographed him.[2] And neither officer, Clay contends, had a sufficiently individualized suspicion of criminality to justify seizing him for purposes of obtaining his photograph.

A consensual encounter "does not require any justification and may be terminated at will by the individual." White v. Commonwealth, 267 Va. 96, 104, 591 S.E.2d 662, 666 (2004). Thus, officers need not have any particularized suspicion to approach "individuals on the street or in other public places" and then put "questions to them if they are willing to listen." United States v. Drayton, 536 U.S. 194, 200 (2002); see also Barkley, 39 Va. App. at 691-93, 576 S.E.2d at 238-39. So long as officers refrain from inducing "cooperation by coercive means," they need no suspicion of criminality to "pose questions, ask for identification, and request consent to search" either the individual or his property. Drayton, 536 U.S. at 201 (citing Florida v. Bostick, 501 U.S. 429, 434-35 (1991)).

An officer questioning a citizen exceeds the scope of his authority and effects a seizure only when, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." California v. Hodari D., 499 U.S. 621, 628 (1991) (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980)). This reasonable-person test "presupposes an *innocent* person." Bostick, 501 U.S. at 438 (emphasis in original). Framed this way, the test guarantees that Fourth Amendment protections do not "vary with the state of mind of the particular individual being approached." Wechsler v. Commonwealth, 20 Va. App. 162, 170, 455 S.E.2d 744, 747 (1995) (citations omitted).

---

[2] Clay similarly framed the issue in the trial court: "The difficulty I then have," Clay's counsel explained, "is really at the point of the photograph, which is what happens."

Several factors determine whether an officer "by means of physical force or show of authority" would cause a reasonable person to feel seized. Mendenhall, 446 U.S. at 553-54; see also Sykes v. Commonwealth, 37 Va. App. 262, 268, 556 S.E.2d 794, 797 (2001). The "threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled," Londono v. Commonwealth, 40 Va. App. 377, 398-99, 579 S.E.2d 641, 651 (2003) (citation omitted), all shed light on whether a seizure has occurred. See also Barkley, 39 Va. App. at 692, 576 S.E.2d at 239.

No one circumstance, however, should be considered apart from the larger context. An encounter — otherwise consensual — does not become a seizure merely because of the presence of several armed officers, Drayton, 536 U.S. at 204-05, or the failure of the officers to inform the person that he is free to ignore further questioning, I.N.S. v. Delgado, 466 U.S. 210, 216 (1984), or their failure to tell the individual he is free to leave, Ohio v. Robinette, 519 U.S. 33, 39-40 (1996). "While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response." Delgado, 466 U.S. at 216.

Equally true, "the mere fact that officers ask incriminating questions" is not itself dispositive — "what matters instead is 'the manner' in which such questions were posed." United States v. Ringold, 335 F.3d 1168, 1173 (10th Cir. 2003) (citation omitted). Even "persistent questioning regarding criminal activity" does not necessarily negate the consensual nature of the conversation. Dickerson v. Commonwealth, 266 Va. 14, 17-18, 581 S.E.2d 195, 197 (2003) (holding that an officer did not seize an individual simply by asking whether he "smoked marijuana" or had any illegal drugs). The proposition that "police officers can approach individuals as to whom they have no reasonable suspicion and ask them potentially

incriminating questions," the United States Supreme Court has emphasized, "is by no means novel; it has been endorsed by the Court any number of times" and has the support of a "long, unbroken line" of judicial decisions. Bostick, 501 U.S. at 439; see also United States v. Kim, 27 F.3d 947, 953 (3d Cir. 1994).

Agreeing with the trial court, we hold that Clay's encounter with Officers Breeden and Nash cannot be fairly characterized as a seizure. The two officers did nothing more than have a conversation with Clay and ask for permission to photograph him. Nothing in the record suggests they coerced Clay into compliance. Neither officer physically touched Clay, made any threats or demands, drew their weapons, or engaged in any other form of aggressive behavior.[3] As in Drayton, there "was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice." Drayton, 536 U.S. at 204.

Under settled principles, the "mere presence of officers who are uniformed and armed does not constitute a 'show of authority' that transforms a consensual encounter into a seizure" under the Fourth Amendment. Dickerson, 266 Va. at 18, 581 S.E.2d at 197 (citation omitted)). The trial court, therefore, did not err in denying Clay's motion to suppress the photograph taken of him by Officer Breeden.

### B. PHOTO LINEUP — VICTIM'S OUT-OF-COURT IDENTIFICATION

Clay next argues that evidence of the victim's selection of his picture from the photo lineup violated his due process rights because the lineup composition unfairly singled him out. The trial court rejected this argument. We do as well.

---

[3] "That most law enforcement officers are armed is a fact well known to the public. The presence of a holstered firearm thus is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon." Drayton, 536 U.S. at 205; Barkley, 39 Va. App. at 694, 576 S.E.2d at 240.

A defendant bears the "weighty burden" of establishing both that the photographic identification procedure was "impermissibly suggestive" and that this created a "substantial likelihood of misidentification." Hodges, 45 Va. App. at 774, 613 S.E.2d at 852 (citing Simmons v. United States, 390 U.S. 377, 384 (1968)); see also Manson v. Brathwaite, 432 U.S. 98, 110 (1977); Winston v. Commonwealth, 268 Va. 564, 593, 604 S.E.2d 21, 38-39 (2004).[4]

Like the trial court, we find nothing impermissibly suggestive about the photographs themselves or the manner in which they were presented to the victim.[5] The photo array consisted of six head shots of black males. The trial court found all six to be "dark complected men with facial hair," well within the range of "reasonable approximations of the description given." The degree of darkness in their skin tones involves only marginal differences. Neither the victim nor the trial court found Clay to be the darkest of the six. Nor was Clay the only "skinny or slender" individual in the photo lineup, a point the victim noted in her testimony. As for the white T-shirt, the photos involve only head shots. Very little below the neckline is shown. None show paint splattered shirts or jeans. The photo array had little, if any, impermissibly suggestive qualities. The trial court, therefore, did not err in rejecting Clay's argument on this ground.[6]

_____

[4] The identification of Clay as the perpetrator rests both on the photo lineup and the in-court identification. Clay did not object at trial to the victim's in-court identification of him as the perpetrator. Nor did he argue that it should be deemed a tainted product of the allegedly unfair photo lineup. Even when a lineup is impermissibly suggestive, an in-court identification of the defendant should still be permitted if nonetheless reliable. Neil v. Biggers, 409 U.S. 188, 199-200 (1972). We need not apply the Biggers reliability principle, however, because Clay did not object to the victim's in-court identification and, in any event, cannot demonstrate that his out-of-court identification was impermissibly suggestive.

[5] No evidence suggests that the officers told the victim that they had evidence that one of the six committed the crime. See Hodges, 45 Va. App. at 775, 613 S.E.2d at 853 (finding the chance of misidentification "heightened" when police tell the victim that "one of the people in the lineup committed the crime").

[6] Given our ruling, we also need not decide whether the victim's in-court identification of Clay rendered harmless the introduction into evidence of the out-of-court identification. See, e.g., Isom v. State, 148 S.W.3d 257, 274 (Ark. 2004) (finding the "failure to object to an in-court

III.

Because the trial court did not err in rejecting Clay's motion to suppress or his due process challenge of the photo lineup, we affirm Clay's conviction for assault and battery.

Affirmed.

---

identification has the effect of waiving any issue relating to an allegedly defective photographic lineup"); Evans v. State, 341 S.E.2d 483, 485 (Ga. Ct. App. 1986) (holding that as the victim's "in-court identification of appellant was not challenged, any error in admitting the out-of-court identification was harmless"); State v. Carriger, 541 P.2d 554, 556 (Ariz. 1975) ("[W]e will presume that a prior identification did not taint the in-court identification where the in-court identification was not challenged at the trial level.").