COURT OF APPEALS OF VIRGINIA

Present:   Judges Humphreys, Russell and AtLee
Argued by videoconference

STEPHEN RAYMOND SAAL

OPINION BY
v.        Record No. 1091-19-1        JUDGE WESLEY G. RUSSELL, JR.
OCTOBER 13, 2020

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
James C. Lewis, Judge

William H. O'Brien (Doummar & O'Brien, on brief), for appellant.

Elizabeth Kiernan Fitzgerald, Assistant Attorney General (Mark R.
Herring, Attorney General, on brief), for appellee.

Stephen Raymond Saal was charged with driving under the influence of alcohol and

refusal to take a breath test. In a pretrial motion, Saal sought to suppress certain evidence,

including statements he made to the arresting officer. After the trial court denied the motion to

suppress, Saal, pursuant to Code § 19.2-254, entered a conditional guilty plea to the driving

under the influence charge.[1] The conditional plea preserved Saal's ability to appeal the trial

court's denial of his suppression motion.

On appeal, Saal argues that the trial court should have granted his motion to suppress

because the police "violated [his] Fourth Amendment rights by entering the curtilage of his home

to gather information pertaining to a criminal investigation during pre-dawn hours by conducting

a 'knock-and-talk' without a warrant." Specifically, Saal contends that the fact that it was

12:30 a.m. when an officer knocked on the door to his home rendered the officer's conduct

---

[1] After accepting Saal's guilty plea to the charge of driving under the influence, the trial
court dismissed the refusal charge pursuant to Code § 18.2-268.4(C).

unreasonable for the purposes of the Fourth Amendment. In light of all of the facts and circumstances, we conclude that the officer's conduct was reasonable, and therefore, the trial court correctly denied Saal's motion to suppress. Accordingly, we affirm the judgment of the trial court.

BACKGROUND

"Under familiar principles of appellate review, we . . . state 'the evidence in the light most favorable to the Commonwealth, the prevailing party in the trial court, and will accord the Commonwealth the benefit of all reasonable inferences fairly deducible from that evidence.'" Sidney v. Commonwealth, 280 Va. 517, 520 (2010) (quoting Murphy v. Commonwealth, 264 Va. 568, 570 (2002)).

So viewed, the evidence establishes that, after midnight on October 1, 2017, off-duty Virginia Beach Police Officer Livers saw a vehicle jump the curb and barely miss hitting a Rite Aid sign at the intersection of Bonney Road and Rosemont Road in Virginia Beach. The vehicle then crossed four lanes of traffic and stopped in the left-turn lane of Virginia Beach Boulevard; the vehicle sat through an entire green-light cycle before driving into a Burger King parking lot. Livers followed the vehicle and observed that the right, front tire was flat. Because Livers had finished her shift, was not in uniform, was not driving a marked police car, and did not believe that the driver of the vehicle had been injured, she did not investigate further. However, she did call police dispatch to report the incident. A police record introduced as evidence established that Livers called dispatch at 12:15 a.m.

Virginia Beach Police Officer Charles Loveless, a member of the Special Operations Traffic Safety Unit, was on duty and received the report resulting from Livers' call to dispatch. Based on the license plate information that Livers had provided, Loveless was able to ascertain the address associated with the vehicle's registration and proceeded to that location, which ultimately proved to be Saal's residence.

At approximately 12:30 a.m., Loveless and his partner, Officer Jessica Little, arrived at the address associated with the vehicle. Loveless parked his police vehicle on the street near the house. From the street, Loveless confirmed that the license plate on the car in the driveway for the residence matched the license plate identified by Livers in her call to dispatch. The officers, one walking on each side of the vehicle, confirmed that the vehicle, a 2010 Lexus SUV, was not occupied, had been damaged, and had a flat right, front tire as Livers had reported. Continuing up the driveway and along a path, the officers walked to the front door of the house.

The front of the house was not lighted, and no one responded when Loveless knocked on the door and rang the doorbell. After waiting for a response without success, Loveless began to walk back down the path towards the driveway. As he did so, he noticed a light illuminating a small window and a door on the side of the house. From his vantage point on the driveway, Loveless determined that there were lights on in that area of the house.

Using a pathway that branched off from the driveway, Loveless approached the lighted side door and knocked. Saal responded and opened the door. Loveless identified himself and asked if Saal owned the vehicle in the driveway. When Saal responded that it was his SUV, Loveless asked if anyone else had been driving it. Saal indicated that no one else had been driving it, that he had driven it that evening, and that he had returned home within the hour.

Loveless then asked Saal if he knew that the SUV was damaged. Saal said no and, without any prompting by Loveless, exited the residence to look at the vehicle. After some further interaction on the driveway, Saal was arrested for driving under the influence of alcohol. He was charged with that offense and, when he refused a breathalyzer test, also was charged with refusal pursuant to Code § 18.2-268.3.

Prior to trial, Saal filed a motion to suppress, alleging that "all physical evidence and statements made was [sic] a product of an unlawful and illegal stop, search, and arrest" of Saal.

Saal argued that, because the encounter occurred shortly after midnight, there was no implicit invitation for Loveless or anyone else to knock on his door, and therefore, Loveless needed a warrant to enter the curtilage of Saal's residence to knock on the door. The trial court rejected Saal's argument, found that Loveless' actions were reasonable within the contemplation of the Fourth Amendment, and denied the motion to suppress.

Faced with the evidence of his encounter with Loveless and Little being admissible, Saal elected to plead guilty to the charge of driving under the influence. Saal, with the approval of the trial court and the consent of the Commonwealth, made his plea pursuant to Code § 19.2-254, allowing him to preserve for appeal the arguments raised in his motion to suppress.[2] This appeal followed, with Saal asserting in his sole assignment of error that "[t]he trial court erred in denying" the "motion to suppress" because the officers "violated [his] Fourth Amendment rights by entering the curtilage of his home to gather information pertaining to a criminal investigation during pre-dawn hours by conducting a 'knock-and-talk' without a warrant."

ANALYSIS

In challenging the trial court's denial of his motion to suppress, Saal "bears the burden of establishing that reversible error occurred." Mason v. Commonwealth, 291 Va. 362, 367 (2016). His argument that Loveless' entry onto his property to knock on his doors was unreasonable for the purposes of the Fourth Amendment presents "a mixed question of law and fact[,]" Robinson v. Commonwealth, 47 Va. App. 533, 548 n.6 (2006) (*en banc*), aff'd, 273 Va. 26 (2007), and

---

[2] In pertinent part, Code § 19.2-254 provides:

> With the approval of the court and the consent of the Commonwealth, a defendant may enter a conditional plea of guilty in a misdemeanor or felony case in circuit court, reserving the right, on appeal from the judgment, to a review of the adverse determination of any specified pretrial motion. If the defendant prevails on appeal, he shall be allowed to withdraw his plea.

thus, is subject to *de novo* review on appeal, id. at 544. In conducting our review, we view "the evidence in the light most favorable to the Commonwealth, the prevailing party in the trial court, and . . . accord [it] the benefit of all reasonable inferences fairly deducible from that evidence." Sidney, 280 Va. at 520 (quoting Murphy, 264 Va. at 570). Thus, although "the ultimate question whether [Loveless'] conduct violated the Fourth Amendment triggers *de novo* scrutiny on appeal, we defer to the trial court's findings of 'historical fact'" unless such findings are "plainly wrong or devoid of supporting evidence." Barkley v. Commonwealth, 39 Va. App. 682, 689-90 (2003) (quoting Davis v. Commonwealth, 37 Va. App. 421, 429 (2002)).

The Fourth Amendment to the United States Constitution provides, in pertinent part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." Thus, by its express terms, it protects not only the individual, but also his or her things, and, most pertinent here, his or her home from unreasonable searches. Questions arise, however, as to what constitutes the "home" and whether any particular intrusion on the home by law enforcement is "unreasonable."

It long has been recognized that, for Fourth Amendment purposes, the home includes more than the interior of a residence: the amendment's protections also extend to "the land immediately surrounding and associated with the home," an area referred to as "the curtilage[.]" Oliver v. United States, 466 U.S. 170, 180 (1984). Because the curtilage is "considered part of home itself for Fourth Amendment purposes[,]" the amendment's protection against unreasonable searches applies to such areas. Id.

There is no dispute that Loveless and Little entered the curtilage of Saal's home when they approached his front and side doors and Loveless knocked. Such areas are "intimately linked to the home, both physically and psychologically," California v. Ciraolo, 476 U.S. 207, 213 (1986), with "[t]he front porch [being] the classic exemplar" of curtilage falling within the

- 5 -

protection of the Fourth Amendment, Florida v. Jardines, 569 U.S. 1, 7 (2013). Our conclusion in this regard, however, is the beginning and not the end of the Fourth Amendment inquiry in this case.

Although the United States Supreme Court has deemed a police officer's entry upon a citizen's curtilage as "presumptively unreasonable absent a warrant[,]" Collins v. Virginia, 138 S. Ct. 1663, 1670 (2018), the high Court also has recognized exceptions to this general presumption. See, e.g., Kentucky v. King, 563 U.S. 452, 460 (2011) (recognizing warrantless entry is permitted to prevent the destruction of evidence); Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006) (recognizing warrantless entry is permitted "to render emergency assistance to an injured occupant or to protect an occupant from imminent injury"); United States v. Santana, 427 U.S. 38, 42-43 (1976) (recognizing that officers may enter the curtilage and even a home without a warrant when in "hot pursuit" of a suspect).

One such exception permits police to enter a citizen's curtilage without a warrant in order to engage in what colloquially has been called a "knock and talk." Robinson, 47 Va. App. at 554. The exception arises from the "implicit license" or invitation a homeowner by custom grants to a wide array of visitors to approach the home, knock on the door, and wait for a response. Jardines, 569 U.S. at 8. As we previously have observed, absent affirmative steps by a homeowner to rescind it,[3] this implied invitation allows all manner of people, including "brush salesmen, newspaper boys, postmen, Girl Scout cookie sellers, distressed motorists, neighbors, [or] friends" to enter the curtilage of the home and knock. Robinson, 47 Va. App. at 546

---

[3] We previously have recognized that a homeowner may limit the implied invitation by installing fencing, gates, or "no trespassing" or "private property" signs to indicate that neither the general public nor a law enforcement officer is invited to approach the home. Robinson, 47 Va. App. at 547-48. Saal took no such steps here. Accordingly, he had not rescinded the implied invitation for law enforcement officers and others to approach his home and knock on his door.

(quoting Shaver v. Commonwealth, 30 Va. App. 789, 796 (1999)).  The invitation also extends to police officers because "[w]hen law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do."  King, 563 U.S. at 469.  Thus, so long as acting within the implied invitation, an officer does not offend the Fourth Amendment by entering upon a home's curtilage and knocking on a door.[4]  Jardines, 569 U.S. at 8.

Acknowledging this principle, Saal asserts that Loveless acted outside of the implied invitation because he knocked on the door in the "pre-dawn hours."  He argues that the issue is one of "time-sensitivity," that is, any implied invitation to the officer or anyone else to knock on Saal's door ceased to exist given the time of night.  In effect, he contends that at some unspecified point in time, perhaps 8:00 p.m., perhaps midnight, but certainly by 12:30 a.m., the implied invitation for a visitor to knock on a door, like Cinderella's coach turning back into a pumpkin at the stroke of midnight, ceases to exist.

Characterizing the issue as "a case of first impression" in Virginia, Saal relies heavily on what he concedes is "dicta" from the majority and dissenting opinions in Jardines.  Specifically, he argues that the majority's seeming agreement, id. at 9 n.3, with Justice Alito's statement that "[n]or, as a general matter, may a visitor come to the front door in the middle of the night without an express invitation," stands for the proposition that nighttime knock and talks violate the Fourth Amendment.  Id. at 20 (Alito, J., dissenting).  Saal's reliance on Jardines in this regard is misplaced.[5]

---

[4] Saal concedes this point, noting on brief in this Court that, "[w]hen conducted within its proper scope, a 'knock and talk' is not a trespass" and does not give rise to Fourth Amendment concerns.

[5] Saal also relies on the decision of the Michigan Supreme Court in People v. Frederick, 895 N.W.2d 541, 546 (Mich. 2017), a decision he concedes is not binding on us and, at most, constitutes "persuasive authority."  In Frederick, the Michigan Supreme Court reasoned "that the

As Saal recognizes, the discussion in <u>Jardines</u> regarding nighttime knocks on a door is clearly dicta. The issue in that case involved police bringing *a drug dog* onto Jardines' front porch *in the daytime*. <u>Id.</u> at 22 (Alito, J., dissenting). Accordingly, any discussion of nighttime knock and talks without a drug dog is unnecessary to the resolution of the case, and thus, cannot be characterized as part of the Court's holding. <u>Newman v. Newman</u>, 42 Va. App. 557, 565 (2004). As such, the <u>Jardines</u> Court's discussion of nighttime door knockers is not controlling here, for "[d]icta cannot serve as a source of binding authority in American jurisprudence." <u>Cooper v. Commonwealth</u>, 54 Va. App. 558, 571 (2009) (internal quotation marks and citations omitted). <u>See also</u> <u>Cohens v. Virginia</u>, 19 U.S. 264, 399 (1821) (recognizing that statements in opinions that "go beyond the case [at bar] . . . may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision").

More importantly, nothing in <u>Jardines</u> fairly can be read as an absolute prohibition on nighttime knock and talks. The very statement from Justice Alito's dissent relied on by Saal, "[n]or, *as a general matter*, may a visitor come to the front door in the middle of the night without an express invitation . . . ," <u>Jardines</u>, 569 U.S. at 20 (Alito, J., dissenting) (emphasis added), is conditional and not absolute. In noting the "general" practice, Justice Alito tacitly recognized that there are also circumstances in which a nighttime visitor may knock on the door absent an express invitation. Thus, whether such a knock falls within the invitation implied by

---

scope of the implied license to approach a house and knock is time-sensitive" and that "there is generally no implied license to knock at someone's door in the middle of the night." From these premises, that court concluded that knock and talks outside of "normal waking hours" cannot fall within the implied license exception to the Fourth Amendment's warrant requirement. <u>Id.</u> at 547 (internal quotation marks and citation omitted). For reasons detailed *infra*, we find this attempt to create a blanket prohibition on nighttime knock and talks inconsistent with the reasonableness standard governing Fourth Amendment issues and decline to adopt such a rule here. Ironically, despite adopting such a rule, the Michigan Supreme Court acknowledged that drawing a bright line in these circumstances is problematic and declined to "decide precisely what time the implied license to approach begins and ends." <u>Id.</u> at 547 n.6.

custom requires a review of the surrounding facts and circumstances and is not subject to a hard and fast, bright-line rule.

The rejection of a hard and fast, bright-line rule in favor of conducting a review of all of the facts and circumstances is wholly consistent with the normal application of the Fourth Amendment's reasonableness standard.[6] As the United States Supreme Court repeatedly has recognized, the "touchstone of the Fourth Amendment is reasonableness." <u>Florida v. Jimeno</u>, 500 U.S. 248, 250 (1991). As such,

> [t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application . . . [and] requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

<u>Bell v. Wolfish</u>, 441 U.S. 520, 559 (1979). Thus, whether any particular action is reasonable for Fourth Amendment purposes "is measured in objective terms by examining the totality of the circumstances." <u>Ohio v. Robinette</u>, 519 U.S. 33, 39 (1996). Accordingly, we must determine whether Loveless conducting a nighttime knock and talk was a reasonable intrusion given all of the facts and circumstances.

Contrary to Saal's assertion, this question does not present a matter of first impression for Virginia's appellate courts. In <u>Robinson</u>, we addressed the reasonableness of an officer entering the curtilage of a home after 11:00 p.m. with the goal of conducting a knock and talk. 47

---

[6] The fact that cases refer to the Fourth Amendment's reasonableness "standard" or "test" as opposed to deeming it a reasonableness "rule" militates against creating bright-line rules to implement the Fourth Amendment's protections. As we have observed in another context, "legal standard[s are] not amenable to the creation of hard and fast rules[.]" <u>Wynnycky v. Kozel</u>, 71 Va. App. 177, 200 (2019). For discussions regarding the implications of adopting a regime of legal "standards," a regime of legal "rules," or a combination of the two, <u>see</u> Michael Coenen, <u>Rules Against Rulification</u>, 124 Yale L.J. 644 (2014), and Antonin Scalia, <u>The Rule of Law as a Law of Rules</u>, 56 U. Chi. L. Rev. 1175 (1989).

Va. App. at 540.  In addressing the propriety of the officer's actions, we noted several factors to consider when determining whether such a nighttime approach was reasonable for purposes of the Fourth Amendment, including:  the time of the approach, whether the officer's approach was open or clandestine, whether the officer confined himself to the driveway and associated pathways where the general public would be expected to go, whether lights were on, and whether cars outside the residence suggested the presence of people who may be awake.  Id. at 549-53.

A majority of these factors support the reasonableness of Loveless' actions.  After parking his car on a public street, Loveless and Little entered Saal's property openly by means of the driveway, as any visitor would be expected to do.  Once on the property, they confined their movements to the driveway and delineated paths off of the driveway that led to doors that appeared to constitute the normal points of ingress and egress from the house.  Although no lights were on at the front door, the area of the house associated with the side door where contact eventually was made was lighted.  That area did not appear to be sleeping quarters, but rather, an area of the house where non-sleeping activities occur.

The only factor that supports Saal's position is that Loveless entered the curtilage at 12:30 a.m.  While helpful to Saal, this fact is not dispositive.  Although it is true that many retire for the night and no longer expect to receive visitors well before midnight, circumstances present here would suggest to a reasonable officer that Saal is not one of those people.  In addition to the lights being on at a point of ingress and egress away from what would be assumed to be the home's sleeping areas, Loveless knew that the damaged car in the driveway had arrived at Saal's home in the last fifteen to twenty minutes, meaning that someone recently had arrived at the home.  The lack of a person in the car strongly suggested that the driver had entered the home, likely by the pathway to the illuminated side door.  Given this, a reasonable officer could conclude that at least some occupants of the house were still awake and active.

- 10 -

We judge Loveless' entry into Saal's curtilage by what information was available at the time of the entry and not by what happened afterwards; however, the subsequent interactions shed light on whether "the scope of the particular intrusion" in this case was minimal. Bell, 441 U.S. at 559. Although we recognize that "a visitor knocking on the door is . . . sometimes unwelcome[,]" Jardines, 569 U.S. at 9, and thus, constitutes an intrusion regardless of whether it violates the Fourth Amendment, knocking, without more, constitutes a minimal intrusion. After all, one of the central interests protected by the Fourth Amendment, Saal's "right . . . to retreat into his own home and there be free from unreasonable governmental intrusion[,]" id. at 6 (quoting Silverman v. United States, 365 U.S. 505, 511 (1961)), did not dissipate when Loveless knocked. Saal remained free not to answer the door because "whether the person who knocks on the door and requests the opportunity to speak is a police officer or a private citizen, the occupant has no obligation to open the door or to speak." King, 563 U.S. at 469-70. Having voluntarily decided to answer the door and speak with Loveless, Saal was under no obligation to "allow the officers to enter the premises" and retained the right to "refuse to answer any questions at any time." Id. at 470. Here, the officer never entered the home and never asked Saal to leave the home. It was Saal who voluntarily exited his home and voluntarily continued to answer Loveless' questions.[7] Given these circumstances, Loveless' intrusion of merely knocking on Saal's door can only be characterized as minimal.

---

[7] Noting that "Loveless did not obtain any evidence [directly] from his physical intrusion onto [Saal]'s property" and that all of "the evidence sought to be suppressed resulted from [Saal]'s subsequent determination to answer the knock at his door and engage [in] consensual conversation with Officer Loveless[,]" the Commonwealth argues that, even if Loveless' initial approach had been unreasonable, Saal's voluntary actions afterward were sufficient to remove any taint and provide an alternative basis for affirming the judgment below. See Kyer v. Commonwealth, 45 Va. App. 473, 483 (2005) (en banc). Because we conclude that Loveless' entry upon Saal's curtilage did not violate the Fourth Amendment, we do not reach the Commonwealth's alternative argument.

- 11 -

In holding that all of the facts and circumstances present here rendered Loveless' entry onto Saal's curtilage reasonable for Fourth Amendment purposes, we think it equally important to note what we do not hold. We do not hold that every knock and talk at 12:30 a.m. is reasonable or even that knock and talks at that hour are presumptively reasonable. Just as the Fourth Amendment's reasonableness standard precludes us from adopting a blanket prohibition on nighttime knock and talks, it also precludes us from adopting a blanket rule that all knock and talks occurring at 12:30 a.m. are presumptively reasonable. We hold only that the reasonableness question is to be answered by an objective review of all of the facts and circumstances and that such a review here demonstrates that Loveless' entry upon the curtilage to conduct a knock and talk was reasonable in this case.[8]

## CONCLUSION

For the reasons stated above, we conclude that Loveless' entry upon Saal's curtilage was reasonable under the facts and circumstances, and therefore, did not violate the Fourth Amendment. Accordingly, the trial court did not err in denying Saal's motion to suppress and its judgment in this matter is affirmed.

Affirmed.

---

[8] Concern for the safety of the driver of the car provides a further justification for concluding that Loveless' approach to the house was reasonable. See Brigham City, 547 U.S. at 403. Although Saal emphasizes that Livers testified that she did not believe that anyone had been injured when she called dispatch and that Loveless testified that the report he received only referenced a potential drunk driver and did not indicate that there might have been injuries, an individual officer's *subjective* belief regarding the potential for injuries is irrelevant; the issue is whether a reasonable officer *objectively* could have believed that someone might have been injured. Mason, 291 Va. at 368 (recognizing that we judge Fourth Amendment reasonableness through an objective lens, rendering the individual "officer's subjective thoughts . . . irrelevant"); see also Brigham City, 547 U.S. at 404. Viewed objectively, the description of how the car had been driven and the resulting damage to the car, both of which were known to Loveless, allow a reasonable officer to conclude that the driver may have been injured.