COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present:   Judges Ortiz, Raphael and Senior Judge Annunziata
Argued at Fairfax, Virginia


JAMES KELVIN JOHNSON

v.      Record No. 0425-24-4

OPINION BY
JUDGE STUART A. RAPHAEL
JULY 8, 2025

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Michael F. Devine, Judge

Amy M. Jordan, Senior Assistant Public Defender, for appellant.

Elizabeth K. Fitzgerald, Assistant Attorney General (Jason S.
Miyares, Attorney General; Lauren C. Campbell, Assistant Attorney
General, on brief), for appellee.


Appealing his firearm and second-degree-murder convictions, James Kelvin Johnson

argues that the trial court erred by failing to suppress the statements he made to detectives while

recovering from a self-inflicted-gunshot wound in a hospital's intensive-care unit. He also

argues that the trial court erred by limiting the testimony of his expert witness. Finding that the

trial court properly denied his suppression motion and that any error in the evidentiary ruling was

harmless, we affirm.

BACKGROUND

We recite the facts in the light most favorable to the Commonwealth, the prevailing party

below. *Camann v. Commonwealth*, 79 Va. App. 427, 431 (2024) (en banc). "Doing so requires

that we 'discard' the defendant's evidence when it conflicts with the Commonwealth's evidence,

'regard as true all the credible evidence favorable to the Commonwealth,' and read 'all fair

inferences' in the Commonwealth's favor." *Id.* (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)).

*The September 2022 shooting*

Johnson shot his wife, D.S.,[1] in the couple's third-floor bedroom just after 3:00 a.m. on September 4, 2022. He called 911 at 3:19 a.m., reporting that he had accidentally shot his wife in the head and that she needed an ambulance. Johnson said that his wife was still breathing.

Several officers from the Fairfax County Police Department responded to the townhome. Unsure of the situation inside, the officers secured the home's perimeter and demanded that Johnson surrender himself. Johnson did not respond. When an officer heard a gunshot, the officers entered the home.

When they reached the third floor, the officers discovered D.S. in the master bedroom, slumped over and suffering from a gunshot wound to her left temple. They rendered aid until paramedics arrived. D.S. was transported by ambulance to the hospital, where she was pronounced dead.

Officers found Johnson in a different bedroom on the third floor, suffering from a self-inflicted-gunshot wound to his upper torso. A firearm lay on the floor. Johnson was groaning in pain. Officers provided aid to Johnson, who asked if his wife was okay. Johnson was transported by ambulance to Inova Fairfax Hospital, where he was admitted at 4:19 a.m. Johnson was first treated in the emergency room and later transferred to the intensive-care unit.

*The hospital interview*

Detective Kyle Bryant was the lead homicide detective assigned to the case. He arrived at the hospital around 6:00 a.m. but left without engaging Johnson in any substantive conversation. Officer Glenn Esser also arrived around 6:00 a.m., dressed in his standard police

---

[1] We omit the victim's name to protect her family's privacy.

uniform. He stood to the side of the door of Johnson's hospital room to provide security. Doing so was "standard procedure" in shooting cases, regardless of whether the patient who had been shot was a victim or a suspect. Esser did not prevent anyone from entering or leaving Johnson's room.

Esser testified that he did not personally speak with Johnson. But from his vantage point, Esser could observe Johnson's condition and overhear his conversations with others. Johnson was not physically restrained. Johnson was awake and alert at 6:00 a.m. but slow to communicate. He became more responsive around 10:00 a.m., answering questions from his nurses and doctors about "medical issues." By 11:30 a.m., Johnson was engaging his nurses and doctors in "normal" dialogue. He was also signing medical evaluations, waivers, and forms. Many nurses and doctors walked in and out of Johnson's room. Esser observed Johnson speaking freely with them.

Esser testified that it was not his job to restrain Johnson, only to observe. Esser never told Johnson that he was not allowed to leave. Esser understood that Johnson was not under arrest and that Esser had no obligation to detain him.

Johnson and Esser could see each other. At one point, Johnson said he wanted to speak to someone about the events of that morning. Esser called Bryant and told him that Johnson "was alert and communicating and was asking questions and wanted to speak to somebody about what had happened."

Bryant returned to the hospital around 11:30 a.m., and Detective David Vesser met him there. Both were dressed in civilian clothes but wore badges of authority and carried sidearms on their hips. Bryant testified that Johnson was "conscious, alert; he was talking." Johnson lay in his bed without physical restraints, but he was wearing an oxygen mask and had EKG pads, a chest tube, and an IV that would have made it difficult for him to get out of bed.

Bryant asked Johnson if he was comfortable speaking, and Johnson said he was. Bryant and Vesser interviewed Johnson for about 41 minutes, and an audio recording of their conversation was introduced into evidence. Bryant read *Miranda*[2] warnings to Johnson but told him that he was not under arrest and that no charges had been filed against him. Johnson indicated that he understood his rights. When Johnson asked if he needed a lawyer, Bryant replied, "that's totally up to you."

Johnson proceeded to describe the shooting incident to Bryant and Vesser. He recalled talking with his wife about her desire to move in a few years. But Johnson did not want to move. Johnson said that his health had seriously declined, causing problems in the couple's marriage. His wife liked to stay busy and go out with friends, but Johnson often was not healthy enough to join in her outings. Johnson said that when the two disagreed, his wife would say he was wrong or "out of line."

Johnson told Bryant that he slept with the gun under his pillow for protection. Johnson said he was messing around with the gun as he surfed channels on the television, pulling it in and out of his pocket and absentmindedly dropping it on the floor. His wife told him to stop playing with it. But Johnson waved the gun in her direction. When D.S. asked, "So you going to shoot me now?," the gun went "pop."

Johnson took responsibility for shooting his wife but said it never should have happened. He told the officers that he never kept a round of ammunition in the gun's chamber; the magazine was the only thing that he kept loaded. He said he had no reason to shoot his wife because she was his "everything."

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Bryant left the hospital and, around 1:00 p.m., swore out an arrest warrant. Bryant returned to the hospital and placed Johnson under arrest by handcuffing him to the hospital bed. A grand jury later indicted Johnson for murder and for using a firearm to commit murder.

*Johnson's suppression motion*

Johnson moved to suppress his hospital statements, arguing that he made them during a custodial interrogation and had not knowingly, intelligently, or voluntarily waived his *Miranda* rights. He also argued that his statements were involuntary.

Officer Esser and Detective Bryant testified at the suppression hearing to the facts set forth above. Johnson called Dr. Paula Ferrada, the Chief of Trauma and Acute Care Surgery at Inova Fairfax Hospital. The trial court recognized Ferrada as an expert in trauma and acute care. She testified that she cared for Johnson when he arrived at the hospital in "extremely critical" condition. Ferrada described the treatment and the medications she administered to Johnson, including pain medications, sedatives, muscle relaxants, and "local narcotics." He received Dilaudid—a pain medication that was "four times stronger than morphine and way stronger than fentanyl." Dilaudid is the "strongest" of the opiates; its side effects include dizziness, slower reaction time, confusion, and impaired memory and decision-making. Johnson had an oxygen mask over his nose and mouth and a blood pressure cuff on his arm. He was connected to an IV tube and an EKG monitor. Ferrada said it would have been difficult for Johnson to leave his room under those conditions. Her shift ended hours before Johnson spoke with Detectives Bryant and Vesser. During her interactions with Johnson, he was responsive and did not appear to be confused.

Johnson testified briefly. He claimed not to remember speaking to any officers at the hospital.[3]

The trial court denied the suppression motion. Based on the totality of the circumstances, the court was not persuaded that Johnson was in custody under *Miranda*, so the court did not reach whether Johnson waived his *Miranda* rights. The court further determined that Johnson's statements were voluntary.

*Johnson's jury trial*

The Commonwealth called 14 witnesses at trial. Johnson's hospital interview with Bryant and Vesser was also played in the Commonwealth's case-in-chief.

The Commonwealth's evidence showed that a Glock 19 semi-automatic firearm was recovered from the bedroom where Johnson shot himself. A crime-scene detective testified that the magazine for the gun could hold 15 rounds of ammunition. There were 13 cartridges in the magazine and 1 spent cartridge casing still in the gun's firing chamber. Another cartridge casing matching the others was recovered from the master bedroom where Johnson shot his wife.

The court received pre-recorded testimony from the medical examiner, Dr. Meghan Kessler, that D.S. died from a gunshot wound to her left temple. She had "stippling"[4] around the wound, which suggested that she was shot at close range—"[l]ess than inches . . . to up to one to two feet" away. The Commonwealth's firearms expert testified that Johnson's gun "was in mechanical operating condition" with functioning safety features. She explained the gun's

---

[3] At trial, by contrast, Johnson testified that he recalled speaking with Detective Bryant at the hospital and had tried to remember as many details as possible. Johnson said that he "was trying to give [Bryant] everything he asked for," and whatever Bryant asked, Johnson "had it fresh."

[4] The medical examiner explained that "stippling can result from burning or unburned gun powder particles" being "released from the muzzle of the gun."

mechanics, including the necessary steps to load and fire it.  She confirmed on cross-examination that to fire the weapon, a cartridge had to be loaded into the chamber.

D.S.'s longtime friend and D.S.'s son also testified.  Both said that D.S. had told them that she was unhappy in the marriage and planned to leave Johnson.

The defense presented Emmanuel Kapelsohn as a firearms expert.  Like the Commonwealth's firearms expert, Kapelsohn explained that firing the Glock 19 required that a round of ammunition be loaded into the chamber; loading the magazine is not enough.

Johnson asked the court to recognize Kapelsohn "as an expert on the subject of firearms and ballistics, firearm training, and unintentional discharges of firearms."  The Commonwealth objected to Kapelsohn's "testifying as an expert in unintentional shootings" because doing so would "go to the ultimate issue" or address cases that were unrelated and irrelevant.  The court requested clarification on whether Kapelsohn would be talking about the "operation of Mr. Johnson's mind" or the "operation of the weapon."  Johnson replied that Kapelsohn would "talk about the operation of the weapon" and, based on his experience, "the common causes of unintentional discharge of firearms."

The court recognized Kapelsohn as an expert but limited his testimony to "the mechanics of the weapon."  The trial judge observed that Kapelsohn "seems to be quite knowledgeable about the operation [of the weapon].  As a psychologist, not so much."  Johnson did not object to the limited scope of Kapelsohn's expert designation.

During Kapelsohn's direct examination, when the defense tried to elicit testimony beyond the designation, the trial court sustained the Commonwealth's objection.  The court permitted Johnson to make the following proffer of what Kapelsohn would have said if permitted to testify:

> So if allowed, I would have asked the question, what is the most
> common reason for an unintentional discharge of this firearm, and
> Mr. Kapelsohn's response would have been that someone

intentionally pulled the trigger thinking that the firearm, that there was no round in the chamber.

I would have also asked, what are some of the other reasons for unintentional discharges of this firearm, and he would have replied that it was involuntary muscular contraction and described what that was.[5]

On cross-examination, Kapelsohn testified that Johnson's firearm had a tactile "loaded chamber indicator," which tells the user "when the chamber is loaded." On redirect, Kapelsohn clarified that the loaded chamber indicator on Johnson's gun was so "subtle" that the user would have to be "trained" to feel it.

Johnson also testified, and his testimony mostly aligned with his recorded statements to Bryant and Vesser at the hospital. He explained that on the night of the shooting, he and D.S. were in the master bedroom; he was looking for a football game on television. D.S. sat in a chair next to the bed and the two were talking about her wanting to move to a different state. Johnson maintained that after the gun fell to the floor, he tried to put it in his pocket; it fell again when Johnson missed his pocket. D.S. warned Johnson to stop playing with the gun. Her last words before he shot her were, "So you going to shoot me now?"

Johnson said he responded "[i]t's not even loaded. Shut up," before he waved the gun in his wife's direction and it went off. Johnson admitted that he had visited the shooting range about twice a month since buying the gun in 2019. He always kept it close for protection, sleeping with it under his pillow at night. Still, Johnson insisted that he never kept a round in the chamber.

The jury found Johnson guilty of second-degree murder and using a firearm to commit murder. The court sentenced him to 16 years' incarceration. Johnson noted a timely appeal.

---

[5] Johnson supplemented his proffer after conclusion of the trial.

ANALYSIS

*I. Motion to Suppress*

Johnson claims that the trial court violated his Fifth Amendment right against self-incrimination by not suppressing his statements at the hospital. He argues that he was in custody when Detectives Bryant and Vesser questioned him. Although Johnson received *Miranda* warnings, he says that his medical condition prevented him from knowingly, voluntarily, and intelligently waiving his *Miranda* rights. He also argues that his hospital statements should have been excluded as coerced and involuntary.

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. That right is also protected "against abridgment by the States" by the Due Process Clause of the Fourteenth Amendment, *Malloy v. Hogan*, 378 U.S. 1, 6 (1964), which provides that no State may "deprive any person of life, liberty, or property, without due process of law," U.S. Const. amend. XIV, § 1, cl. 3; *see Malloy*, 378 U.S. at 8 ("The Fourteenth Amendment secures against state invasion the same privilege that the Fifth Amendment guarantees against federal infringement—the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will . . . .").

But the constitutional privilege against self-incrimination "generally is not self-executing." *Minnesota v. Murphy*, 465 U.S. 420, 425 (1984). A person must affirmatively invoke the privilege if he wishes to remain silent in response to questions from the government that elicit incriminating information. *Id.* at 427, 429. "This is sometimes called the 'invocation requirement.'" *Thomas v. Commonwealth*, 82 Va. App. 80, 114 (2024) (en banc) (quoting *Salinas v. Texas*, 570 U.S. 178, 183 (2013) (plurality opinion)).

For instance, a witness who wishes to rely on the privilege when subpoenaed to testify at trial or before a grand jury must "invoke[] the privilege and show[] that he faces a realistic threat of self-incrimination." *Murphy*, 465 U.S. at 427. If the witness chooses instead "to answer, his choice is considered to be voluntary since he was free to claim the privilege and would suffer no penalty as the result of his decision to do so." *Id.* at 429. Indeed, even a probationer who is required to meet regularly with his probation officer and truthfully answer the questions put to him is generally required to affirmatively invoke the privilege if he wants to remain silent in response to questions that would elicit incriminating answers. *Id.* at 440.

The Supreme Court has identified "two exceptions" to the invocation requirement. *Salinas*, 570 U.S. at 184. "First, . . . a criminal defendant need not take the stand and assert the privilege at his own trial." *Id.* (citing *Griffin v. California*, 380 U.S. 609, 613-15 (1965)). "Second, . . . a witness'[s] failure to invoke the privilege must be excused where governmental coercion makes his forfeiture of the privilege involuntary." *Id.* The Supreme Court has been reluctant to create additional exceptions "to the 'general rule' that a witness must assert the privilege to subsequently benefit from it." *Id.* at 186 (declining to create "a third exception to the invocation requirement for cases in which a witness [not in custody] stands mute and thereby declines to give an answer that officials suspect would be incriminating").

Johnson relies on the second exception to the invocation requirement: when governmental coercion renders the defendant's "forfeiture of the privilege involuntary." *Id.* at 184. The Court held in *Miranda* "that a suspect who is subjected to the 'inherently compelling pressures' of an unwarned custodial interrogation need not invoke the privilege." *Id.* (quoting *Miranda v. Arizona*, 384 U.S. 436, 467-68, 468 n.37 (1966)). "Due to the uniquely coercive nature of custodial interrogation, a suspect in custody cannot be said to have voluntarily forgone

- 10 -

the privilege 'unless [he] fails to claim [it] after being suitably warned.'" *Id.* at 184-85 (alterations in original) (quoting *Murphy*, 465 U.S. at 429-30).

*Miranda* set forth the warnings that must be given to a suspect who is subjected to a custodial interrogation, including that the suspect has the right to remain silent and the right to request an attorney before or during questioning. 384 U.S. at 479. "[F]ull comprehension of the rights to remain silent and request an attorney [is] sufficient to dispel whatever coercion is inherent in the interrogation process." *Davis v. United States*, 512 U.S. 452, 460 (1994) (alterations in original) (quoting *Moran v. Burbine*, 475 U.S. 412, 427 (1986)). In other words, "once proper *Miranda* warnings are given, it resets the defendant's obligation to invoke his right to remain silent if he wants further questioning to stop." *Thomas*, 82 Va. App. at 116.

"A defendant who makes incriminating statements after being warned under *Miranda* may move to suppress those statements on the ground that his *Miranda* waiver was not voluntary, knowing, and intelligent, as well as on the ground that his confession itself was coerced and not voluntary." *Id.* at 101. Johnson makes both claims here, and we analyze them in turn.

*A. Because Johnson was not in police custody, there was no* Miranda *violation.*

*Miranda* warnings "are required only when a suspect is both in custody and subjected to interrogation." *Watts v. Commonwealth*, 38 Va. App. 206, 214 (2002); *Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam) ("only where there has been such a restriction on a person's freedom as to render him 'in custody'" (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam))). "In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there [was] a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.'" *Stansbury*, 511 U.S. at 322 (alteration in original) (quoting

- 11 -

*California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam)). "[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Id.* at 323.

"Whether the circumstances of [a police interview] were such as to require *Miranda* warnings is a mixed question of law and fact." *Spinner v. Commonwealth*, 297 Va. 384, 392 (2019). "On appeal, we review such questions de novo but defer to the fact-finder's findings of historical fact unless they are plainly wrong or without evidence to support them." *Id.* In doing so, we "view the evidence in the light most favorable to the prevailing party, here the Commonwealth, together with all inferences that may reasonably be drawn from it." *Id.*

Johnson asserts that the trial court erred by finding that he was not in custody when questioned at the hospital. Johnson reasons that Bryant administered *Miranda* warnings, Johnson was the lone suspect, a uniformed officer was standing at the door of his hospital room, and his medical condition rendered him unable to leave.

The United States Supreme Court has consistently treated "custody" as "a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508-09 (2012). To determine "whether a person is in custody in this sense, the initial step is to ascertain whether, in light of 'the objective circumstances of the interrogation,' a 'reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.'" *Id.* at 509 (alteration in original) (first quoting *Stansbury*, 511 U.S. at 322-23; and then quoting *Thompson v. Koehane*, 516 U.S. 99, 112 (1995)). "Not all restraints on freedom of movement amount to custody for purposes of *Miranda*." *Id.*

The *location* of the interrogation is relevant but not dispositive. For instance, a suspect is not necessarily in custody despite being questioned at a police station.[6] Nor is an inmate necessarily in custody when held in prison and questioned about a crime that occurred outside the prison.[7] Conversely, a suspect who is questioned in his own home could be in custody for *Miranda* purposes if the conditions are sufficiently coercive.[8]

When police have questioned a suspect who is hospitalized, courts have sometimes found the suspect to be in custody for *Miranda* purposes and sometimes not. *See* Kimberly F. Winbush, *What Constitutes "Custodial Interrogation" at Hospital by Police Officer Within Rule of* Miranda v. Arizona *Requiring that Suspect Be Informed of His or Her Federal Constitutional Rights Before Custodial Interrogation—Suspect Hospital Patient*, 30 A.L.R.6th 103 (2008 & 2024 Supp.) (collecting cases). As in other contexts, courts must consider "all of the circumstances surrounding the interrogation." *Stansbury*, 511 U.S. at 322. "[N]o single factor alone may necessarily establish custody for *Miranda* purposes, and not all factors may be relevant in a given case." *Wass v. Commonwealth*, 5 Va. App. 27, 33 (1987).

---

[6] *See, e.g.*, *Mathiason*, 429 U.S. at 495 ("[P]olice officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect."); *Aldridge v. Commonwealth*, 44 Va. App. 618, 643 (2004) ("[T]he fact that the detectives asked Aldridge to speak with them at a police facility, rather than her dormitory room, does not automatically convert the meeting into a custodial situation."); *Bottenfield v. Commonwealth*, 25 Va. App. 316, 320, 329 (1997) (holding that defendant was not in custody when questioned during an "informal interview" at the sheriff's office).

[7] *See, e.g.*, *Howes*, 565 U.S. at 516 (holding that an inmate was not in custody where, among other considerations, he was "told at the outset of the interrogation, and was reminded again thereafter, that he could leave and go back to his cell whenever he wanted").

[8] *See, e.g.*, *Wass v. Commonwealth*, 5 Va. App. 27, 33 (1987) ("[E]ven in the home, police domination of the scene may produce a coercive environment and an abridgment of freedom, and *Miranda* warnings may be required before questioning.").

In the context of a suspect who is questioned at the police station, we identified the relevant circumstances to

> include: "(1) the manner in which the individual is summoned by the police, (2) the familiarity or neutrality of the surroundings, (3) the number of officers present, (4) the degree of physical restraint, (5) the duration and character of the interrogation, and (6) the extent to which the officers' beliefs concerning the potential culpability of the individual being questioned were manifested to the individual."

*Aldridge v. Commonwealth*, 44 Va. App. 618, 642 (2004) (quoting *Harris v. Commonwealth*, 27 Va. App. 554, 565 (1998)).

The circumstances relevant to the "in custody" determination are broader when police question a suspect who is being treated at a hospital. The 2008 A.L.R. annotation and our unpublished cases[9] involving police questioning at a hospital suggest the following non-exhaustive list of potentially relevant considerations:

- Whether others were present during questioning, "such as medical staff and visitors and family of the patient."[10]

- The "time of day" of questioning, "with questioning that occurs during the middle of the day, as opposed to late at night, suggesting that police have not created a custodial situation."[11]

- Whether law-enforcement officers accompanied the suspect to the hospital.[12]

---

[9] We may consider such unpublished decisions as "informative" though not "binding." Rule 5A:1(f).

[10] 30 A.L.R.6th at 120; *see Stevenson v. Commonwealth*, No. 1614-19-1, slip op. at 7-8, 2020 Va. App. LEXIS 288, at *10 (Nov. 24, 2020) ("Hospital staff interrupted when they needed to conduct business or treat appellant. Appellant's family member was also allowed to be in the hospital room with him."); *Nixon v. Commonwealth*, No. 1768-06-3, slip op. at 3, 2008 Va. App. LEXIS 148, at *2 (Mar. 25, 2008) ("Appellant's daughter and nurses were present during the interview.").

[11] 30 A.L.R.6th at 120.

[12] 30 A.L.R.6th at 120; *see Stevenson*, slip op. at 7-8, 2020 Va. App. LEXIS 288, at *10 (defendant "voluntarily transported himself" to the hospital).

- Whether the police maintained a constant presence at the patient's hospital room.[13]

- Whether the suspect was prevented from leaving the hospital by police or, instead, by the patient's medical condition.[14]

- The number of officers involved in the questioning.[15]

- Whether the suspect agreed to speak or cooperate with police.[16]

- Whether "the tone of a police interview with a hospital patient [was] . . . accusatorial," or "friendly and neutral."[17]

- The length of the interview.[18]

---

[13] 30 A.L.R.6th at 120; *see Stevenson*, slip op. at 8, 2020 Va. App. LEXIS 288, at *11 ("[W]hile Officer Ramirez was standing near the door, he was 'not guarding the door or stopping the door.'").

[14] 30 A.L.R.6th at 121; *see Kincaid v. Commonwealth*, No. 1381-22-2, slip op. at 11, 2023 Va. App. LEXIS 837, at *17 (Dec. 19, 2023) ("Kincaid was neither handcuffed nor restrained in any way. Neither his, nor anyone else's, movements into or out of his exam or hospital room were restricted by law enforcement."); *Rhodes v. Commonwealth*, No. 0697-22-2, slip op. at 11, 2023 Va. App. LEXIS 665, at *15 (Oct. 3, 2023) ("Although we are mindful of Rhodes's vulnerable physical position, there is no indication that Detective Horn sought to exploit that condition."); *Stevenson*, slip op. at 8, 2020 Va. App. LEXIS 288, at *11 (suspect was "not handcuffed, locked in the room, or otherwise restrained"); *Nixon*, slip op. at 9, 2008 Va. App. LEXIS 148, at *15 (Appellant's "confinement was caused by [her] own physical incapacity—not police compulsion. At no time did the police attempt to physically restrain [appellant]: [she] was not handcuffed, nor did the police guard [her] hospital room to prevent [her] escape." (alterations in original) (quoting *DeJesus v. State*, 655 A.2d 1180, 1191 (Del. 1995))).

[15] 30 A.L.R.6th at 121; *see Kincaid*, slip op. at 11, 2023 Va. App. LEXIS 837, at *17 (questioning officer was the "only" officer present); *Stevenson*, slip op. at 8, 2020 Va. App. LEXIS 288, at *10-11 ("[W]hile five officers were present at the hospital, there were only three who stayed in appellant's room, and only one was in uniform. . . . While more than one officer was present in appellant's hospital room during questioning, we conclude that the number of officers in the present case does not suggest coercion.").

[16] 30 A.L.R.6th at 122; *see Nixon*, slip op. at 2, 2008 Va. App. LEXIS 148, at *2 (defendant was "talkative, cooperative, and willing to answer questions").

[17] 30 A.L.R.6th at 122.

[18] 30 A.L.R.6th at 122; *see Kincaid*, slip op. at 11, 2023 Va. App. LEXIS 837, at *17 ("very brief and consisted of very few questions"); *Stevenson*, slip op. at 9, 2020 Va. App.

- The timing of the suspect's arrest in relation to the interview.[19]

As in other interrogation contexts, "the ultimate inquiry into whether an individual is subject to custodial interrogation is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *Keepers v. Commonwealth*, 72 Va. App. 17, 34 (2020) (quoting *Spinner*, 297 Va. at 392).

Considering the totality of circumstances, we agree with the trial court that Johnson was not in custody when Detectives Bryant and Vesser questioned him at the hospital. Bryant did not question Johnson when he first saw him around 6:00 a.m. Bryant returned to the hospital to speak with Johnson at 11:30 a.m., only after Officer Esser told him that Johnson had asked to speak with someone about what happened. Although Esser was dressed in his police uniform and stood at the hospital door for security, he did not speak with Johnson. As doctors and nurses walked in and out of the room, Johnson was alert, spoke freely with them, and asked questions. The medical equipment connected to Johnson would have made it difficult for him to get out of bed, but his immobility was not caused by the police; Johnson was receiving essential medical care because he had shot himself in the chest.

Moreover, Bryant did not force the conversation. Although Bryant took the precaution to read Johnson his *Miranda* rights, Bryant told Johnson that he was not under arrest and that no charges had been filed. He asked if Johnson wanted to speak with him and Johnson said he did. Bryant and Vesser conversed with Johnson in a mild tone, asking open-ended questions, not

LEXIS 288, at *12 ("The questioning lasted no more than twenty to thirty minutes, and it did not prolong or interfere with his medical treatment." (footnote omitted)); *King v. Commonwealth*, No. 2619-97-1, slip op. at 3, 1998 Va. App. LEXIS 618, at *4 (Dec. 8, 1998) ("single question, posed by one police officer to an unrestrained defendant, in a neutral hospital setting, incidental to the routine investigation of a traffic accident").

[19] 30 A.L.R.6th at 122; *see Kincaid*, slip op. at 11, 2023 Va. App. LEXIS 837, at *17 ("Kincaid was not taken into custody at the conclusion of either interview.").

accusatory ones.  *See* 30 A.L.R.6th at 122 ("[W]here the tone is friendly and neutral, courts usually find no custody.").

Given those facts, the invocation rule applied: if Johnson wished to assert his right to remain silent in response to police questioning, he had to affirmatively invoke it.  The situation here was no more coercive than a myriad other situations in which law-enforcement officers question suspects who are not in custody.  *See* notes 6-7 *supra*.

Johnson relies on our unpublished decision in *Commonwealth v. Corrales*, No. 2360-00-2, 2001 Va. App. LEXIS 109 (Mar. 6, 2001), but we find it distinguishable. Corrales, who was later indicted for murdering her newborn infant, had been questioned by police three times in her hospital room as she recovered from the delivery.  Slip op. at 1-2, 2001 Va. App. LEXIS 109, at *1-2.  Her visitors were asked to leave when the police arrived, and her boyfriend and her medical providers were not allowed to be present when the police questioned her.  *Id.* at 4-5, 2001 Va. App. LEXIS 109, at *6.  Police provided *Miranda* warnings in the third interview, but they continued to question her after she "unambiguously requested an attorney three times."  *Id.* at 4-6, 9-10, 2001 Va. App. LEXIS 109, at *6-7, 11.  Taking the facts in the light most favorable to Corrales—who had won her suppression motion—the panel found that she was in custody for *Miranda* purposes and that the police violated *Miranda* by not stopping their interrogation.  *Id.* at 9-10, 2001 Va. App. LEXIS 109, at *11-12.  In this case, by contrast, we take the facts in the light most favorable to the Commonwealth.  And Johnson has failed to identify any improper conduct or coercion by police.

We reject Johnson's argument that by providing *Miranda* warnings, the detectives effectively conceded that Johnson was "in custody" for *Miranda* purposes.  We agree with Professor LaFave and his colleagues that "it would be bizarre if such solicitude for a suspect not actually in custody were deemed to make the suspect's statement subject to suppression under

*Miranda*." Wayne R. LaFave et al., *Criminal Procedure* § 6.6(f) at 836 (4th ed. 2015).  Or as Judge Wilkinson put it, to find that "the reading of *Miranda* warnings to a suspect should by itself create custody . . . would convert admirable precautionary measures on the part of officers into an investigatory obstruction."  *Davis v. Allsbrooks*, 778 F.2d 168, 172 (4th Cir. 1985).

Our caselaw is more nuanced than that.  We said in *Barkley v. Commonwealth*, 39 Va. App. 682 (2003), that providing *Miranda* "warnings does not necessarily place the individual 'in custody' at the level of restraint associated with a formal arrest."  *Id.* at 694.  So reading a defendant his *Miranda* rights "does not transform an otherwise consensual encounter into an investigatory seizure."  *Id.*  For instance, officers might give *Miranda* warnings "out of 'an abundance of caution.'"  *Id.* at 695.  "On the other hand, coupled with *other indicia of coercion*, it might corroborate the objective reasonableness of the individual's belief that he was not free to leave."  *Id.* at 694-95 (emphasis added).  Such other indicia of coercion were present in *Corrales*. We find none here.

In short, Johnson was not in custody for *Miranda* purposes when he was questioned at the hospital.  We therefore reject his claim that his *Miranda* waiver was invalid.  The fact that Johnson was not in custody means that no waiver was required in the first place.[20]

*B.  Johnson's statements at the hospital were not coerced.*

Johnson also argues that, even if his *Miranda* rights were not violated, his statements to the detectives at the hospital were made involuntarily and should have been excluded under the Due Process Clause.  He says that he "was in extremely critical condition after undergoing life-

_____

[20] We thus do not reach the Commonwealth's argument that Johnson waived his *Miranda* rights by choosing to testify at trial.  *See Paxton v. Commonwealth*, 80 Va. App. 449, 466-69 & n.7 (2024) (explaining that a defendant whose *Miranda* objection has been overruled does not waive the objection by choosing to testify in his own defense in response to the erroneous admission of his confession), *aff'd on other grounds*, ___ Va. ___ (May 29, 2025).

saving medical interventions." He "was suffering from a self-inflicted gunshot wound, wearing an oxygen mask, and had a chest tube inserted into his torso." He was taking medicine that can "impair a person's ability to process information and make decisions." He previously had only minimal experience with the criminal-justice system.

We "must make an independent evaluation of the evidence to determine whether the confession[] w[as] voluntary. In doing so, we may rely upon the observations of the trial judge and his findings of fact, except as to the ultimate issue of voluntariness." *Morris v. Commonwealth*, 17 Va. App. 575, 579 (1994); *see also Thomas*, 82 Va. App. at 102 ("[W]hen determining the admissibility of *a confession*, 'the ultimate issue of "voluntariness" is a legal question.'" (quoting *Miller v. Fenton*, 474 U.S. 104, 110 (1985))).

To evaluate whether a statement is voluntary, we examine "the totality of the circumstances to determine whether the statement is the 'product of an essentially free and unconstrained choice by its maker,' or whether the maker's will 'has been overborne and his capacity for self-determination critically impaired.'" *Rodriguez v. Commonwealth*, 40 Va. App. 144, 157 (2003) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)). We consider "both 'the details of the interrogation' and 'the characteristics of the accused.'" *Id.* (quoting *Kauffmann v. Commonwealth*, 8 Va. App. 400, 405 (1989)). Regarding the interrogation, we consider the "techniques employed, including evidence of trickery and deceit, psychological pressure, threats or promises of leniency, and duration and circumstances of the interrogation." *Keepers*, 72 Va. App. at 41 (quoting *Terrell v. Commonwealth*, 12 Va. App. 285, 291 (1991)). Relevant characteristics of the accused include his "age, intelligence, mental and physical condition, background and experience with the criminal justice system." *Id.* (quoting *Washington v. Commonwealth*, 43 Va. App. 291, 302 (2004)).

Johnson's argument here focuses only on his weakened state at the hospital, neglecting the question of whether the police acted coercively to induce his statements. But the privilege against self-incrimination protected by the Fifth and Fourteenth Amendments has a state-action requirement. The Fifth Amendment provides that no person "shall be *compelled* in any criminal case to be a witness against himself." U.S. Const. amend. V, cl. 3 (emphasis added). The Due Process Clause of the Fourteenth Amendment provides that no State "shall . . . *deprive* any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1, cl. 3 (emphasis added). "Because only state action may violate a criminal defendant's due process rights, 'coercive police activity is a necessary predicate to the finding that a confession is not "voluntary" within the meaning of the Due Process Clause of the Fourteenth Amendment.'" *Bottenfield v. Commonwealth*, 25 Va. App. 316, 323 (1997) (quoting *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)); *accord Gaskins v. Clarke*, ___ Va. ___, ___ (July 25, 2024) (per curiam) ("[A] deprivation of liberty or property is not, under the Due Process Clause, 'attributable to a State unless it is traceable to the State's power or authority.'" (quoting *Lindke v. Freed*, 601 U.S. 187, 198 (2024))); *French v. Va. Marine Res. Comm'n*, 64 Va. App. 226, 234 (2015) ("With a few notable exceptions, the Constitution restrains only state action—not the actions of private individuals.").

*Connelly* aptly shows why police coercion is required to render a confession involuntary. While in a psychotic state induced by chronic schizophrenia, Connelly approached an off-duty police officer and confessed to murdering a young girl. 479 U.S. at 160-61. After the officer provided *Miranda* warnings, Connelly said he understood his rights but still wanted to talk about the murder. *Id.* at 160. He described how he killed the child and showed the officers where he did it. *Id.* Despite finding that "the police had done nothing wrong or coercive," the trial court determined the confession was involuntary because "Connelly's illness destroyed his volition

and compelled him to confess." *Id.* at 162. The Colorado Supreme Court affirmed, concluding that the confession was not "the product of a rational intellect and a free will." *Id.* at 162 (citation omitted). The Supreme Court reversed. "Absent police conduct causally related to the confession," the Court said, "there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." *Id.* at 164. In other words, "some sort of 'state action'" is essential to show a violation of the Due Process Clause. *Id.* at 165.

We followed *Connelly* in *Commonwealth v. Peterson*, 15 Va. App. 486 (1992). We said that the level of police coercion sufficient to render a confession involuntary "may be lower if the defendant's ability to withstand the coercion is reduced by intoxication, drugs, or pain, but *some* level of coercive police activity must occur before a statement or confession can be said to be involuntary." *Id.* at 488.

Johnson identifies no police coercion that was used in questioning him, even considering his weakened and medicated state. To the contrary, Johnson willingly spoke with the detectives. The questions were open-ended, not accusatory or leading. The detectives did not use any "trickery [or] deceit, psychological pressure, threats or promises of leniency." *Keepers*, 72 Va. App. at 41 (quoting *Terrell*, 12 Va. App. at 291). Johnson was told he was not under arrest. He was not restrained. Even though Johnson was not in custody, Detective Bryant took the precautionary step to read him his *Miranda* rights, something that, even in a custodial setting, "resets the defendant's obligation to invoke his right to remain silent if he wants further questioning to stop." *Thomas*, 82 Va. App. at 116. And the interview was not unduly long, lasting only 41 minutes. *Compare Morris*, 17 Va. App. at 580 (finding the confession voluntary despite that it resulted from "three interrogation sessions over a period of approximately six hours"), *with Mincey v. Arizona*, 437 U.S. 385, 396 (1978) (finding the confession involuntary where the defendant was interrogated for nearly four hours while incapacitated and sedated in an

intensive-care unit). The evidence supports the trial court's finding that, throughout the interview, Johnson was "fully engaged in this conversation, completely understanding."

We disagree with Johnson that *Mincey* and *Peterson* show that his confession was involuntary. Mincey was wounded in a shootout at his apartment during a narcotics raid in which a police officer was killed. *Mincey*, 437 U.S. at 387. Mincey "arrived at the hospital 'depressed almost to the point of coma'" and suffered damage to his "sciatic nerve and partial paralysis of his right leg." *Id.* at 396, 398. The interrogating officer "told Mincey he was under arrest for the murder of a police officer," questioned him for about four hours after reading him *Miranda* warnings, and refused to stop the interrogation despite Mincey's repeated requests for a lawyer. *Id.* at 396. Because Mincey had already been arrested, there was no question that he was in a custodial interrogation. The Court held that the resulting confession was involuntary and therefore inadmissible. *Id.* at 400-02.

Nothing like that occurred here. Unlike Mincey, Johnson was told he was not under arrest. Unlike Mincey, Johnson declined to invoke his right to remain silent after being read *Miranda* warnings. And the tone of the questioning was gentle, not aggressive.

*Peterson* is likewise distinguishable. Peterson moved to suppress statements he made to a police officer who rode with him in an ambulance to the hospital. *Peterson*, 15 Va. App. at 488. But Peterson had been arrested and was already in police custody before the officer accompanied him to the hospital. *Id.* Notably, several police officers had injured Peterson while apprehending him. *Id.*[21] Peterson "was unable to understand 'everything that was going on

---

[21] According to the record in *Peterson*, one police officer had struck Peterson on the shoulder with a baton, another kneed him twice in the back while he lay face down on the street, and a third struck him in the shoulder three times with his fist. *See* Brief of Appellee at 2-5, *Commonwealth v. Peterson*, 15 Va. App. 486 (1992) (No. 1428-92-4). Peterson was then transported to and interrogated at the police station until his continuing chest pains and request for an ambulance prompted his emergency transport to the hospital. *Id.* at 4-5.

around' him as a result of [his] injuries." *Id.* Although the trial court "found no misconduct" by police when they arrested Peterson and later transferred him to the hospital, the court "concluded that the defendant's statements made in response to police questioning, while in the ambulance . . . , were involuntary and, therefore, inadmissible." *Id.* We affirmed. *Id.* at 489. Viewing the evidence in the light most favorable to Peterson, we upheld the trial court's finding "that the police authority, asserted when the defendant was especially susceptible, overbore his will and, thus, was coercive police activity rendering his statements involuntary and inadmissible." *Id.* at 488.

Unlike in *Peterson*, we take the facts here in the light most favorable to the Commonwealth. Unlike Peterson, Johnson had not been arrested, was not in police custody when questioned, and had not been previously interrogated at the police station before being rushed to the hospital. Nor did the officers here control Johnson's access to emergency medical care. As the trial judge put it, this "was one of the most mild interrogations" the court had "ever read about, listened to, observed, [or] encountered."

In sum, the record here shows that the police did not engage in any coercive tactics when they interviewed Johnson at the hospital. So the trial court did not err in finding that Johnson's statements were voluntary.

## II. *Expert Testimony*

Johnson argues in his second assignment of error that "the trial court erred by limiting the defense expert's testimony on the subject of unintentional discharges of firearms." He says that the trial court should have permitted Kapelsohn to testify that the most common reason for the unintentional discharge of a firearm is not knowing that a round of ammunition has been chambered. The Commonwealth objected at trial on the ground that Kapelsohn's testimony would "go to the ultimate issue" and would not be relevant. Johnson's opening brief argues that

Kapelsohn's testimony would not have addressed the ultimate issue of whether Johnson accidentally shot his wife but simply show the most common reason for accidental shootings. He says this testimony is no different from the expert's testimony permitted in *Stevens v. Commonwealth*, 72 Va. App. 546 (2022), that "it is 'very common' for child victims of abuse to wait weeks, months, or years to initially report the offense." *Id.* at 552. He also notes that the Supreme Court recently held in *Diaz v. United States*, 602 U.S. 526 (2024), that an expert's testimony in a drug-trafficking case "that most drug couriers know that they are transporting drugs" was admissible and did not go to the ultimate issue of whether the defendant herself was knowingly transporting drugs. *Id.* at 528, 538.

We assume without deciding that Johnson's argument is preserved.[22] We further assume without deciding that the trial court erred by excluding Kapelsohn's testimony. Even so, we find that putative error to be harmless.

Our Supreme Court recently addressed the standard of review for non-constitutional harmless error. *See Shaw v. Commonwealth*, ___ Va. ___ (Apr. 17, 2025). "A non-constitutional error is deemed harmless when we 'can conclude that the error did not influence the jury or had but slight effect.'" *Id.* at ___ (quoting *Commonwealth v. Kilpatrick*, 301 Va. 214, 216 (2022) (per curiam)). "'To reach this conclusion, the evidence of guilt must be so overwhelming that it renders the error insignificant by comparison such that the error could not

---

[22] It is not clear that Johnson preserved his argument below or adequately addressed it in the opening brief. *See* Rules 5A:18; 5A:20(e). The trial court excluded Kapelsohn's testimony on the ground that he was unqualified to render an opinion on the mental state of persons who accidentally discharge a firearm, not on the ground that Kapelsohn's testimony addressed the ultimate issue. Johnson's opening brief focused primarily on the ultimate-issue question. *See Lafferty v. Fairfax Cnty. Sch. Bd.*, 293 Va. 354, 365 (2017) ("Absent argument and authority, an assignment of error is deemed to be abandoned."). On the other hand, Johnson does argue in passing that Kapelsohn was qualified to render the excluded opinion. Johnson Br. 33-44. Because the waiver question presents a close call, the harmless-error doctrine provides the better and narrower ground for decision.

have affected the' outcome." *Id.* at ___ (quoting *Kilpatrick*, 301 Va. at 217). "In a criminal case, we must be able to conclude that if the error had not occurred, the jury still would have convicted the defendant." *Id.* at ___ (citing *Kotteakos v. United States*, 328 U.S. 750, 764 (1946)).[23] In *Shaw*, for instance, the Court found harmless the exclusion of the defense expert's testimony about the defendant's impaired mental state—evidence offered to negate culpability. But the Court found "'the evidence of guilt . . . so overwhelming that it render[ed] the [alleged] error insignificant by comparison such that the [alleged] error could not have affected the' outcome." *Id.* at ___ (third and fourth alterations in original) (quoting *Kilpatrick*, 301 Va. at 216-17).

"[H]armless error review requires 'case-specific application of judgment.'" *Id.* at ___ n.10 (quoting *Welsh v. Commonwealth*, ___ Va. ___, ___ (Mar. 20, 2025)). In conducting that analysis, "we must place [the expert's] proffered testimony into the context of the trial. This requires a review of the elements of the offense, the potential effect of [the expert's] opinions regarding those elements, and how those opinions fit with all of the other evidence in the case." *Id.* at ___.

Using that approach here, we find that the jury's guilty verdict would not have been different had Kapelsohn been permitted to testify that most accidental shootings occur because the shooter is unaware that a round is in the chamber. The jury was instructed that second-degree murder requires proof of malice and that malice could be inferred "from the deliberate use of a deadly weapon." The jury was also instructed that the crime of using a

---

[23] In adopting the standard of review for non-constitutional error in *Clay v. Commonwealth*, 262 Va. 253 (2001), the Court found the federal standard in *Kotteakos* persuasive and consistent with Code § 8.01-678. *Id.* at 259-60. Code § 8.01-678 provides that "[w]hen it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached, no judgment shall be . . . reversed . . . [f]or any . . . error committed" by the trial court.

firearm while committing a murder could be shown by proof that Johnson "used a firearm . . . while committing murder."

The jury knew Johnson's theory that the shooting was not deliberate; Johnson repeatedly insisted that he accidentally shot his wife because he did not think that a round was chambered. The jury heard Johnson say on the recording of the 911 call that "I was playing with my gun and I shot my wife." It heard him repeatedly say in the hospital interview that he does not keep a bullet in the chamber and did not know what was different this time. He could "always pull the trigger and there was nothing in it."

The jury was also well aware that an accidental shooting could occur if the trigger was pulled by a person who was unaware that a bullet was chambered. The Commonwealth's expert and Kapelsohn both testified that the mechanics of the weapon required a person to chamber a round to fire it. The key question for the jury to resolve was whether Johnson deliberately or accidentally shot his wife. Kapelsohn's testimony that it was common for unintentional shootings to occur because the shooter does not know a round is chambered only indirectly addressed that question.

By contrast, the evidence overwhelmingly showed that Johnson shot his wife deliberately, not accidentally. The jury heard testimony that Johnson had a motive to shoot her. A long-time friend testified that D.S. had become unhappy in the marriage and planned to leave Johnson. D.S.'s son testified that she also told him that there was nothing left for her in the marriage and that she planned to leave Johnson. D.S. last told her son that in August 2022, the month before Johnson shot her.

Johnson's claim that he shot his wife accidentally was also undermined by his own testimony. To start, Johnson's testimony revealed that he was quite knowledgeable about his Glock. He bought it in 2019 and, since then, had practiced firing it twice a month at the shooting

range. He had taken a five-hour course in gun safety to obtain a concealed-carry permit. He slept with the gun under his pillow. As Kapelsohn testified, the gun had an indicator on the side of the weapon showing that a round was chambered; though "subtle," the indicator could be felt by someone who was "well trained."

And in recounting the shooting, Johnson's own testimony tended to refute that he accidentally shot his wife. Johnson admitted that his wife told him before he shot her "that she still was planning to move" out, though he said it would be "in a couple years." He said he kept picking up and dropping the gun when his wife told him, "Stop playing with it." He admitted that she said, "So you going to shoot me now?," strongly suggesting that he was pointing it at her. And at close range. Dr. Kessler's testimony placed the gun from no more than two feet to "less than inches" away from the victim's left temple. Johnson said he responded, "[i]t's not even loaded. Shut up." But Johnson admitted, "I waved my hand up, and then it went off." From the 911 recording, the jury also heard Johnson's demeanor after shooting his wife; he sounded calm and detached, though he said his wife was still breathing.

"Taken as a whole," we find the evidence that Johnson deliberately shot his wife to be "overwhelming." *Kilpatrick*, 301 Va. at 218. We also find that excluding Kapelsohn's testimony that most unintentional shootings occur because the shooter does not know a round is chambered "did not influence the jury[] or had but slight effect." *Id.* at 216 (alteration in original). Accordingly, any error in excluding Kapelsohn's testimony was harmless.

CONCLUSION

The trial court properly denied Johnson's suppression motion and committed no reversible error in excluding Kapelsohn's testimony.

*Affirmed.*